ESTATE OF LEO P. KAUFMAN, DECEASED, ALPH C. KAUFMAN, EXEC-
UTOR, AND ESTATE OF IDA W. KAUFMAN, DECEASED, ALPH C. KAUF-
MAN, EXECUTOR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 68587. Filed January 30, 1961.

*Lee S. Jones, Esq.*, for the petitioners.
*Bart A. Brown, Jr., Esq.*, for the respondent.

BRUCE, *Judge:* This proceeding involves a deficiency in income
tax for the year 1955 in the amount of $1,255.89. The sole issue is
whether an amount of $5,200 is properly excludible as "sick pay"
under section 105 (d), I.R.C. 1954.

### FINDINGS OF FACT.

Petitioners are the Estate of Leo P. Kaufman, deceased, Alph C.
Kaufman, Executor, and the Estate of Ida W. Kaufman, deceased,
Alph C. Kaufman, Executor.

Leo P. Kaufman, hereinafter referred to as the decedent, died on
January 28, 1958, at the age of 87. Ida W. Kaufman, his wife, died
in March 1959. Prior to their deaths the decedent and his wife resided
in Louisville, Kentucky. They filed a joint Federal income tax return
for the year 1955 with the district director of internal revenue,
Louisville, Kentucky.

In 1926 the decedent organized the Louisville Home Federal Sav-
ings and Loan Association, hereinafter referred to as the association,
and served as its managing officer, with the title of secretary-treasurer,
from that time until shortly after June 1953.

In June 1953 decedent suffered a stroke as a result of which he was
incapacitated for some period of time. From the time of this stroke
until the time of his death decedent was not continuously confined to
his home, but he did remain in his home most of the time during that
entire period, venturing outside only on rare occasions. He visited
the office of the association only once after his stroke.

At the time of his stroke in June 1953 decedent was secretary-
treasurer of the association and a member of its board of directors.
Shortly after his stroke the board of directors elected decedent execu-

tive vice president-treasurer of the association. Apparently at the same time, C. H. Burkholder was elected secretary of the association and thereafter he assumed the management of its day-to-day affairs. At a meeting of the association's board of directors held January 20, 1955, decedent was reelected as executive vice president, treasurer, and chairman of the board of directors, and C. H. Burkholder was reelected as secretary. Prior to decedent's election to that office the association had not had an "executive vice president." Decedent continued to hold the position of executive vice president until his death.

Sometime shortly after he suffered his stroke the decedent expressed his reluctance to remain a member of the board of directors. On November 30, 1953, the board of directors wrote a letter to the decedent which stated in part:

It is the sense of this Board that what you have done to make the Louisville Home Building Association in the past and the present Louisville Home Federal Savings & Loan Association the fine exhibit it is, can be best expressed in our pride to be able to retain you as a board member always, not only for your value as such to the Association, but an inspiration to all of us.

Our Association has earned a unique position in its field thru your guidance. Few men combine your rare human qualities and the business acumen that has created for our effort here the affection of the borrowing public and at the same time challenges the respect of the investor, and as long as our institution can command the services of men like you the imputation of a "soulless corporation" can never tarnish its reputation.

Regardless of your present incapacity to attend meetings it is the desire of the Board that you remain one of its active members, as your consultation on vital matters should always be at the command of the institution's officers and directors.

It is our prayer that some day your recovery will permit you to get down to the office and actively in harness again. Until then be patient and consider yourself on a well earned vacation and leave of absence for the duration.

At the time of his stroke in June 1953, decedent was receiving a salary of $8,700 per year from the association. Decedent continued to receive the same annual salary from June 1953 until he died.

From the time of decedent's stroke to at least a couple of months before his death, and particularly during the year involved, Burkholder visited him at his home from once a week to two or three times a month to discuss the affairs of the association.

On one other occasion the association retained a sick employee on its payroll. In that instance a teller required an operation which would cause her absence from work for a lengthy period of time. The association's board of directors instructed Burkholder to inform her that she would remain on the payroll for 1 year. After being absent for approximately 6 or 7 months she obtained another job and was thereafter dropped from the association's payroll.

Sometime during the latter part of 1955 the association put into effect a retirement pay plan for its employees.

On their income tax return for the year 1955, the decedents reported the amount of $8,700 as income, but treated $5,200 thereof as qualifying for the sick pay exclusion.

OPINION.

After suffering a stroke in June 1953 decedent did not return to his job as managing officer of the Louisville Home Federal Savings and Loan Association, but continued to receive the same annual salary until his death in January 1958. During the year 1955 decedent received the sum of $8,700 from his employer, of which amount decedents excluded $5,200 from their gross income as "sick pay." Respondent has determined that said amount of $5,200 does not qualify for the sick pay exclusion under section 105, I.R.C. 1954.[1]

Section 105(a) provides that amounts received by an employee through accident or health insurance for personal injuries or sickness are includible in his gross income to the extent that such amounts are attributable to contributions by the employer which were not includible in the gross income of the employee, or are paid by the employer, unless such amounts are excluded from gross income by section 105 (b), (c), or (d).

Under the provisions of section 105(d), wages or payments in lieu of wages received by an employee through accident or health insurance for a period during which the employee is absent from work on account of personal injuries or sickness are excludible from gross income, subject to certain limitations which are not here under contention. For purposes of section 105(d) amounts received under

---

[1] SEC. 105. AMOUNTS RECEIVED UNDER ACCIDENT AND HEALTH PLANS.

(a) AMOUNTS ATTRIBUTABLE TO EMPLOYER CONTRIBUTIONS.—Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer.

\* \* \* \* \* \* \*

(d) WAGE CONTINUATION PLANS.—Gross income does not include amounts referred to in subsection (a) if such amounts constitute wages or payments in lieu of wages for a period during which the employee is absent from work on account of personal injuries or sickness; but this subsection shall not apply to the extent that such amounts exceed a weekly rate of $100. In the case of a period during which the employee is absent from work on account of sickness, the preceding sentence shall not apply to amounts attributable to the first 7 calendar days in such period unless the employee is hospitalized on account of sickness for at least one day during such period. If such amounts are not paid on the basis of a weekly pay period, the Secretary or his delegate shall by regulations prescribe the method of determining the weekly rate at which such amounts are paid.

(e) ACCIDENT AND HEALTH PLANS.—For purposes of this section and section 104—
(1) amounts received under an accident or health plan for employees, and
(2) amounts received from a sickness and disability fund for employees maintained under the law of a State, a Territory, or the District of Columbia,
shall be treated as amounts received through accident or health insurance.

an accident or health plan for employees are treated as amounts received through accident or health insurance. Sec. 105(e).

For wage continuation payments to an employee to qualify for the sick pay exclusion provided by section 105(d), such payments must be received by the employee: (1) Through accident or health insurance or under an accident or health plan for employees, (2) for a period during which the employee is absent from work on account of personal injuries or sickness.

Respondent's position is that petitioners have failed to meet their burden of proving that the amounts received by decedent in 1955 from the association were received in accordance with the terms of an accident or health plan of the association, or that the decedent's absence from work in 1955 was due to a personal injury or sickness.

There is considerable doubt whether an accident or health *plan* existed within the meaning of section 105. We are not unmindful of the liberalizing intent indicated by the legislative history of that section. See, generally, Comment, "Taxation of Employee Plans," 64 Yale L.J. 222 (1954). Likewise, a liberal construction is evidenced by the Treasury regulations promulgated under section 105 which speak in terms of an "arrangement" and "program, policy, or custom having the effect of a plan." Sec. 1.105–5.[2] However, the recurrent statutory use of the term "plan" or "plans," as well as the comment in the Senate Finance Committee's report (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 185 (1954)), that section 105, as adopted, "specifies that the exemption is to be granted only to benefits paid out under an arrangement which constitutes a plan," indicates that the use of "plan" signifies something more than merely one or more *ad hoc* benefit payments. Had Congress intended to exclude from gross income all *ad hoc* benefit payments arbitrarily made at the complete discretion of the employer in the absence of any sort of prior arrangement or practice, the use of the term "plan" would scarcely have been necessary.

The evidence that the association had an arrangement or plan for the payment of sick pay to its employees is, to say the least, meager. Burkholder, the managing officer of the association, in answer to the

---

[2] Treasury regulations.

Sec. 1.105–5. Accident and health plans.—* * * In general, an accident or health plan is an arrangement for the payment of amounts to employees in the event of personal injuries or sickness. A plan may cover one or more employees, and there may be different plans for different employees or classes of employees. An accident or health plan may be either insured or noninsured, and it is not necessary that the plan be in writing or that the employee's rights to benefits under the plan be enforceable. However, if the employee's rights are not enforceable, an amount will be deemed to be received under a plan only if, on the date the employee became sick or injured, the employee was covered by a plan (or a program, policy, or custom having the effect of a plan) providing for the payment of amounts to the employee in the event of personal injuries or sickness, and notice or knowledge of such plan was reasonably available to the employee. * * *

question, "Did your company have any policy or plan with respect to sick pay of its employees?" testified: "It's always been the policy of our board or the Association to continue the pay of employees when they are ill." He testified to only one other specific instance, however, where payments were made to a sick employee and apparently that occurred after decedent's stroke, since Burkholder made the arrangements. We are not convinced that this testimony, without more, is sufficient to establish that a "plan" existed within the meaning of section 105.

In any event, petitioners have not, in our opinion, established that the payments in question were made pursuant to any accident or health plan it may have had. After his stroke decedent continued as an officer of the association until his death, as executive vice president and treasurer. He also served as chairman of the board of directors. Although he visited the office of the association only once after his stroke, he was frequently consulted as to the affairs of the association. From the time of his stroke until at least a couple of months before his death, Burkholder visited decedent from once a week to two or three times a month to discuss association business. The letter which the association's board of directors sent to the decedent after his stroke evidences an intent to retain the benefit of his advice, business acumen, and prestige. It speaks in terms of retaining and commanding decedent's services and states that "Regardless of your present incapacity to attend meetings it is the desire of the Board that you remain one of its active members and your consultation on vital matters should always be at the command of the institution's officers and directors."

In our opinion, the payments in question constituted compensation for decedent's services. It is true that, after his stroke, decedent no longer served the association full time. However, as the organizer and long-time managing officer of the association, his counsel and advice were undoubtedly valuable to the association. As was stated in *Smoky Mountain Beverage Co.*, 22 T.C. 1249, 1254, "A part-time officer, having exceptional ability, wide contacts, and a reputation for financial responsibility, might well be worth more to a corporation than a full-time officer lacking these desired qualities." See also *Miller Mfg. Co. v. Commissioner*, 149 F. 2d 421.

Considering the evidence as a whole, we hold that petitioners have not established that any part of the payments made to decedent in the year 1955 is excludible from gross income under the provisions of section 105(d).

*Decision will be entered for the respondent.*