Samuel C. ANDRESS, Administrator W.W.A. of the Estate of Harry O. Polsky, Deceased, Plaintiff

v.

UNITED STATES of America, Defendant.

Civ. A. No. 35152.

United States District Court
N. D. Ohio, E. D.

Sept. 27, 1961.

Duane L. Isham, Richard E. Guster, Wise, Roetzel, Maxon, Kelly & Andress, Akron, Ohio, for plaintiff.

Russell E. Ake, U. S. Atty., Cleveland, Ohio, for defendant.

KALBFLEISCH, District Judge.

This is an action for the recovery of individual income taxes paid for the years 1954–1956 in the amount of $9,733.53, with the interest thereon.

In the early 1890's and until the time of his death in June of 1958, plaintiff's decedent, Harry O. Polsky, was an employee in a department store in Akron, Ohio, known as Polsky's. From 1913 to 1928, the store was owned and operated by the A. Polsky Company. From 1915 until 1928, Harry O. Polsky was part owner and President of the A. Polsky Company and shared control of the business with his brother, Bert A. Polsky.

In 1928, a number of department stores, including the A. Polsky Company store merged into the Hahn Department Store. The owners of the merging stores received stock in Hahn for their individual interests; however, the individual stores were operated in much the same manner as they had been prior to the merger. In 1933 or 1934, Hahn became known as Allied Stores, Inc.

After the merger, the A. Polsky Company was operated as a Division of Allied Stores, Inc., and Harry O. Polsky continued as President of Polsky's and his brother, Bert A. Polsky, continued as Vice President and Managing Director. They exercised full responsibility over the policy making, merchandising, management and operation of Polsky's subject only to supervision by the officers of Allied Stores, Inc. From 1928 to 1945, their responsibilities remained constant, and during that period they were compensated "on a salary, a nominal salary, and a bonus arrangement based on a number of factors." Tr. 53. Each received a salary of $15,000 per year. In 1945, at the suggestion of Bert A. Polsky, some of the responsibilities of the two Polskys were transferred, first to a Mr. McCormack and later to a Mr. E. D. Warner.

In 1945, Harry O. Polsky and Bert A. Polsky decided that "Without the full responsibility for the operations, it seemed as though we should not even ask for a share of the profits; that we should take a straight salary and enjoy none of the profits in the showing, because we didn't have the final say." Tr. 54.

Although Harry O. Polsky and Bert A. Polsky were relieved of their policy making functions in the operation of the Polsky store, they retained the titles of President and Vice President, respectively, and, with the exception of the policy making functions, they continued with their work as before. In 1950 or 1951, Mr. E. D. Warner became Managing Director of the store and was named President. At that time Harry O. Polsky became Honorary Chairman of the Board and Bert A. Polsky was named Chairman of the Board; however, there was no change in their duties.

In November of 1945, at the time the Polskys relinquished their policy making responsibilities, Bert A. Polsky met with a Mr. Puckett (then President of Allied Stores, Inc.) at the Polsky store. At that meeting they discussed the changes which had been made at the Polsky Division and also discussed arrangements which had been made by Mr. Puckett with former owners of other stores now in Allied Stores, Inc. At that meeting, Mr. Puckett agreed to the changes' being made and also agreed that Harry O. Polsky and Bert A. Polsky would no longer participate in or receive payments from the profit sharing bonus, but that each would be paid $15,000 a year for the rest of his life. It also was agreed that each would be paid whether he worked or not, or whether he was ill or in good health. Tr. 58, 59, 60 and 61.

In addition to the testimony of Bert A. Polsky as to his conversations with Mr. Puckett and the further fact that, under the direction of Mr. E. D. Warner, President of Polsky's, Harry O. Polsky was paid a salary of $15,000 a year until the date of his death, the evidence discloses that Harry O. Polsky and Bert A. Polsky, on occasions other than the last illness of Harry O. Polsky, received their full salaries when absent due to illness. Tr. 36, 55, 56, 57, 58, 59, 66 and 67.

In addition to the foregoing facts, the parties have stipulated as follows:

"1. Plaintiff is a resident of Akron, Ohio and is the duly appointed and acting Administrator W.W.A. of the Estate of Harry O. Polsky, Deceased.

"2. Plaintiff's decedent was completely incapacitated on account of sickness from the Spring of 1953 until his death on June 17, 1958. During the entire period from November 1954 until his death, plaintiff's decedent was confined to a hospital in Akron, Ohio. On account of this illness plaintiff's decedent was unable to perform any services at any time during the period from the Spring of 1953 until his death. Each week during this period of illness, plain-tiff's decedent was paid sums of money in excess of $100.00 by or through Polsky's of Akron, the Akron store of the Allied Department Store chain.

"3. On or before April 15, 1955 plaintiff's decedent paid as tax on his income for the year 1954 the sum of $14,224.40 to the District Director of Internal Revenue at Cleveland, Ohio; plaintiff's decedent returning his taxable income for such year at $31,204.21 (having failed to exclude from income under Section 105 of the Internal Revenue Code of 1954 any amount on the basis he had received wages during 1954 while absent from work on account of sickness).

"4. On or about April 17, 1955 plaintiff's decedent filed with the District Director of Internal Revenue at Cleveland, Ohio a claim for credit of an alleged overpayment of income tax for the year 1954 in the amount of $3,801.49, said claim for credit being based upon the ground plaintiff's decedent was entitled to exclude from gross income with respect to the year 1954 the amount of $5200.00 on the basis he had received such amount as wages while absent from work on account of sickness, therefore claiming that the taxable income of plaintiff's decedent for the year 1954 was $26,004.21. A copy of said claim for credit is attached to plaintiff's original complaint as 'Exhibit A.' Said claim for credit requested that the amount of $3,801.49, the amount of the alleged overpayment for the year 1954, be credited against the estimated tax of plaintiff's decedent for the year 1955.

"5. On or about July 25, 1957 the aforesaid claim for credit was disallowed (to the extent of $3,222.31) by defendant and an additional tax for the year 1955 in the amount of $3,222.31 (together with $236.47 interest) was assessed against and collected from plaintiff's

decedent. Payment of said additional tax and interest was made on or about July 25, 1957 to the District Director of Internal Revenue at Cleveland, Ohio.

"6. On or about May 27, 1957 defendant determined an additional tax in the amount of $3,224.00 on the income of plaintiff's decedent for the year 1955. Said additional tax was in addition to the additional tax described in paragraph 5 hereof and was based upon defendant's position that plaintiff's decedent was not entitled to the $5200.00 exclusion he claimed for the year 1955 on the basis he had received such amount as wages while absent from work on account of sickness. Said additional tax together with $231.48 interest was paid by plaintiff's decedent to the District Director of Internal Revenue at Cleveland, Ohio on or about August 26, 1957.

"7. On or about August 26, 1957 plaintiff's decedent filed with the District Director of Internal Revenue at Cleveland, Ohio a claim for refund of income tax paid for the year 1955 in the amount of $3,224.00. Said claim for refund, a copy of which is attached to plaintiff's original complaint as 'Exhibit B,' was based upon the ground plaintiff's decedent was entitled to exclude from gross income for the year 1955 the amount of $5200.00 on the basis he had received such amount as wages while absent from work on account of sickness.

"8. The claim for refund described in the preceding paragraph was disallowed by defendant on or about December 12, 1958.

"9. On or about August 22, 1959 plaintiff, on behalf of his decedent, filed with the District Director of Internal Revenue at Cleveland, Ohio, a claim for refund of income tax paid for the year 1955 in the amount of $3,222.31. Said claim for refund, a copy of which is attached to plaintiff's amended complaint as 'Exhibit B,' was based upon the ground plaintiff's decedent was entitled to apply against his income tax liability for the year 1955 the full amount of $3,801.49, the alleged overpayment of taxes for the year 1954, as set forth in the disallowed claim for credit.

"10. At the time of the making of this stipulation no decision as to the claim for refund described in the preceding paragraph has been rendered by defendant.

"11. On or about July 24, 1957 defendant determined an additional tax in the amount of $3,287.22 on the income of plaintiff's decedent for the year 1956. Said additional tax was based upon defendant's position that plaintiff's decedent was not entitled to the $5200.00 exclusion he took for the year 1956 on the basis he had received such amount as wages while absent from work on account of sickness. Said additional tax together with $71.16 interest was paid by plaintiff's decedent to the District Director of Internal Revenue at Cleveland, Ohio on or about August 28, 1957.

"12. On or about August 28, 1957 plaintiff's decedent filed with the District Director of Internal Revenue at Cleveland, Ohio a claim for refund of income tax paid for the year 1956 in the amount of $3,287.22. Said claim for refund, a copy of which is attached to plaintiff's original complaint as 'Exhibit C,' was based upon the ground plaintiff's decedent was entitled to exclude from gross income for the year 1956 the amount of $5200.00 on the basis he had received such amount as wages while absent from work on account of sickness. Said claim for refund was received by defendant on or about September 3, 1957.

"13. The claim for refund described in the preceding paragraph was disallowed by defendant on or about December 12, 1958.

"14. In the event plaintiff is entitled to a refund of income tax, the amount of such refund shall be computed by the Internal Revenue Service; provided, however, if the parties are unable to agree to the amount so computed by the Internal Revenue Service, the matter shall be submitted to the court for determination."

Plaintiff takes the position that his decedent was paid $15,000 a year by his employer before, during and after the period involved herein, that the moneys were paid to the decedent in each of the years 1954–1956, during which period he was incapacitated and unable to work, under a prior agreement which was a wage continuation plan within the scope of Section 105(d) of the Internal Revenue Code, 26 U.S.C.A. § 105(d), and that, therefore, $100.00 per week of such payments was properly excludable from decedent's gross income. The defendant, relying largely upon Estate of Kaufman v. Commissioner, 35 T.C. 663, insists that the moneys paid to plaintiff's decedent during this period and to the time of his death were "mere *ad hoc*[1] payments not sufficient to constitute "a plan" under Section 105(d).

The evidence of the plaintiff has established that plaintiff's decedent received $15,000.00 a year from 1945 to the time of his death whether he worked or was absent from work on account of sickness, or for any other cause.

Both parties look to Section 1.105–4(a) (3) (i) of the Income Tax Regulations to support their respective contentions. Said section provides, in part, as follows:

"Section 105(d) applies only to amounts attributable to periods during which the employee would be at work were it not for a personal injury or sickness. Thus, an employee is not absent from work if he is not expected to work because, for example, he has reached retirement age.
\* \* \*"

Defendant also interprets Section 1.105–4(a) (2) (i) of the Regulations as implying that since a wage continuation plan qualifies if it is applicable until an employee returns to work or reaches retirement age, "if the employee reaches retirement age the payments no longer qualify." Defendant's Supplemental Brief, pp. 14, 15.

During the period of time involved herein the A. Polsky Division of Allied Stores, Inc., had in effect a plan which provided for the retirement of certain of its employees at the age of sixty-five but no such retirement plan was applicable to plaintiff's decedent and there was no evidence that he had retired. Moreover, the evidence clearly establishes that plaintiff's decedent would have been at work during the period involved had he not been ill; and, as there was no evidence that if he had recovered he would not have returned to work, the portions of the Regulations referred to above, insofar as they pertain to an employee's retirement, are inapplicable to this case.

Defendant's contention that the agreement between Puckett, President of Allied Stores, Inc., and Bert A. Polsky, Vice President and Managing Director of the Polsky Division, in November of 1945, whereby Allied Stores, Inc., would pay each of the Polskys $15,000 a year for the rest of his life, was not sufficient to constitute a wage continuation plan under Section 105(d) of the Code depends upon (1) whether plaintiff, in order to prove the existence of such a plan, was required to introduce witnesses from Allied Stores, Inc., to verify Bert A. Polsky's testimony, and (2) whether the payments to the decedent failed to qualify because of an inference that they could have been terminated by Allied Stores, Inc., prior to Harry O. Polsky's death had it desired to do so.

---

[1] *Ad hoc* is defined in Webster's New International Dictionary, 2d Ed., as follows: "Pertaining to, or for the sake of, this case alone;—said of a hypothesis or reason adduced to explain a phenomenon or class of phenomena, and having no other application by which its validity and significance can be tested."

First, it should be noted that under Section 1.105–5 of the Regulations a wage continuation plan need not cover more than one employee. In my judgment, the testimony of Bert A. Polsky as to the nature and extent of the agreement with Puckett was neither refuted nor impeached and, therefore, is sufficient to sustain the burden of proof. The consideration for the agreement was the relinquishment by the Polskys of their profit sharing and policy making positions and Harry O. Polsky's continued highly valued service as a former owner and as an executive in the Polsky Division of Allied Stores, Inc. Similarly, there being no evidence to the contrary, the testimony of Bert A. Polsky that the agreement provided for the payment of salary to plaintiff's decedent for life, whether he worked or was absent from work and whether he was ill or in good health, is sufficient for the purpose of this lawsuit to hold that the terms of said agreement were enforceable and that plaintiff's decedent could have recovered thereon had Allied Stores, Inc., terminated these payments.

■ While it is generally true that statutes allowing deductions from gross income are strictly construed, Deputy v. Du Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416; Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29, it is also recognized that the courts "have been liberal in construing Congressional enactments intended to give tax relief to injured or sick employees." Jackson v. United States, 59–1 USTC par. 9171, at page 71, 283 (D.C., E.D.Wis., 1958).

In Epmeier v. United States, 7 Cir., 1959, 199 F.2d 508, the Court was required to interpret Section 22 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 22, which provided, insofar as relevant here, as follows:

"(b) *Exclusions from gross income.* The following items shall not be included in gross income and shall be exempt from taxation under this chapter: * * *.

"(5) *Compensation for injuries or sickness.* * * * amounts received through accident or health insurance or under workmen's compensation acts, as compensation for personal injuries or sickness, plus the amount of any damages received whether by suit or agreement on account of such injuries or sickness, * * *."

The Court held that payments to plaintiff during a period of illness were properly excludable from gross income under the foregoing statute even though not made pursuant to a plan similar to a formal insurance contract requiring the payment of premiums, but, rather, under the terms of his employment agreement. The Court's language, at page 511, is applicable to the statute as later amended to include "wages or payments in lieu of wages," and to the facts of this case:

"As we have indicated, we know of no reason why this insurance, when provided as a part of the contract of employment between employee and employer, must follow any stereotyped or conventional form. Surely there is no legal magic in form; the essence of the arrangement must determine its legal character. We conclude that the fact that there is no formal contract of insurance is immaterial, if it is clear, as here, that, for an adequate consideration, the company has agreed and has become liable to pay and has paid sickness benefits based upon a reasonable plan of protection of its employees."

The doctrine of the Epmeier case was approved and followed by the Supreme Court in Haynes v. United States, 1957, 353 U.S. 81, 77 S.Ct. 649, 1 L.Ed.2d 671.

■ It is my conclusion that the bringing of this action was timely, that this Court has jurisdiction, and that the payments in question did, in all respects, meet the statutory requirements of 26 U.S.C.A. § 105(d) so as to permit $5,200 in each of the years 1954–1956, inclusive,

to be properly excludable from the gross income of Harry O. Polsky.

Judgment will be rendered for the plaintiff in accord with the provisions of Item 14 of the Stipulation.

This memorandum is adopted as findings of fact and conclusions of law under the provisions of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.