Timothy L. Pickle, Jr., and Gladys A. Pickle v. Commissioner.
Pickle v. Commissioner
Docket Nos. 5930-69, 7676-70.
United States Tax Court
T.C. Memo 1971-304; 1971 Tax Ct. Memo LEXIS 26; 30 T.C.M. (CCH) 1300; T.C.M. (RIA) 71304; November 30, 1971, Filed. *26 Petitioner has established that his employer had a "wage continuation plan" under sec. 105(d) of the I.R.C. of 1954 and that its payments to him were made pursuant to such plan until October 1, 1967. However, it was a condition of the plan that payments would be made only so long as the employer understood that the recipient would return to work, and petitioner does not meet that test for post October 1, 1967, payments. Carle E. Davis, McGuire, Woods & Battle, 1400 Ross Bldg., Richmond, Va., for the petitioners. J. Doyle Tumbleson, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioners' income tax as follows: Taxable Year Ended
Deficiency
December 31, 1967
$1,007.84
December 31, 1968
1,351.17 The sole issue for decision is whether petitioners are entitled to exclude certain amounts from their gross income as sick pay under the provisions of section 105(d). [1]
Findings of Fact Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Petitioners, Timothy L. Pickle, Jr., and Gladys A. Pickle, filed their joint income tax returns for the taxable years 1967 and 1968 with the internal revenue service center, Philadelphia, Pennsylvania. Petitioners resided at 3808 Kensington Avenue, Richmond, Virginia, at the time of the filing of the petition *28 herein. Gladys A. Pickle is a petitioner solely because she filed joint Federal income tax returns with her husband, Timothy L. Pickle, Jr., for the years in issue. Timothy L. Pickle, Jr., will hereinafter be referred to as the petitioner. Petitioner and his son, Timothy L. Pickle, III, formed a partnership in July 1950. Out of this partnership grew Tax Services of Virginia, Inc. (hereinafter referred to as Tax Services or the corporation), which was organized in May 1965. Tax Services is a tax return preparation firm controlling and operating 63 H&R Block Company franchise offices within the State of Virginia. It is a small corporation of limited means, employing 10 to 12 permanent, yearround employees and approximately 300 temporary employees hired during the tax return filing season. At the beginning of 1967 petitioner was president of Tax Services, a member of its board of directors, and the owner of 50 percent of its outstanding capital stock. Petitioner managed the corporations's Richmond offices in addition to being an active and effective president. Petitioner's son and wife owned 49 percent and 1 percent, respectively, of Tax Services' outstanding capital stock. Petitioner's *29 son was also vice president of the corporation. On March 26, 1967, petitioner became ill and was hospitalized. He was 67 years old at the time. After he was hospitalized, petitioner suffered several strokes which left him paralyzed in his arms and legs and he has performed no services for the corporation since the onslaught of this illness. At the onset of his illness in 1967 petitioner's salary from Tax Services was $250 per week. Petitioner continued to receive $250 per week from Tax Services until October 1, 1967, when his compensation was reduced to $100 per week by the corporation's board of directors and he was still receiving $100 per week from Tax Services at the date of trial. Petitioner excluded $3,540 and $5,200 from his gross income for the taxable years 1967 and 1968, respectively, on the ground that these amounts were "sick pay" under section 105(d). Respondent disallowed these exclusions and determined a deficiency based on these amounts. Before petitioner's illness Tax Services had no written plan for compensating employees unable to work on account of 1301 illness. However, the corporation had up to that time invariably followed a policy established in *30 May 1965 of paying in full all of its permanent employees absent from work on account of illness, as long as it was understood that the employee would return to work. This policy provided no clear criteria for determining when an employee's sick pay would be terminated in the event of an extended illness. This aspect of the policy had never been defined because prior to petitioner's illness the longest absence from work due to illness of a permanent employee encountered by the corporation was from February 24, 1966, to March 30, 1966, a period of five weeks. The next longest period during which Tax Services fully compensated an ill employee was for no more than a week. The power to terminate sick pay was solely within the discretion of the corporation's board of directors. Prior to petitioner's illness, notice or knowledge of the corporation's wage continuation policy had been specifically imparted to all of the employees covered by the policy, and all such employees had a definite expectation that they would receive sick pay during an illness. Tax Services executed one-year contracts with its employees to secure their services. The contracts were either renegotiated in May or *31 continued in effect from year to year. On May 1, 1967, the board of directors of Tax Services passed a resolution dealing with petitioner's illness. Present at the meeting were petitioner's wife, Gladys Pickle, and petitioner's son, both of whom were directors. Gladys Pickle was also there in her capacity as petitioner's duly authorized attorney-in-fact. The following is excerpted from the minutes of that meeting. Mr. T. L. Pickle, III, advised that his father, T. L. Pickle, Jr., had been taken seriously ill during the last week of March and since that time had been unable to fully perform his duties as President of the Corporation. He stated that it appeared uncertain at this time as to when his father would be able to resume his duties full time, but that he felt he would be available for consultation with regard to some of the problems being faced by the Corporation. In the discussion it was pointed out that there has heretofore been no set rule as to how long an employee of the Corporation would be paid in the event of sickness or disability but that it had been the practice in the past of the Corporation to continue an employee at full pay for at least a period of two weeks *32 during any sickness. The Corporation had no case of extended sickness or disability. Upon motion duly made, seconded and unanimously carried, the following resolutions were adopted: RESOLVED, that all employees shall be entitled to full pay for absence due to sickness or disability for twelve (12) working days during any calendar year. RESOLVED, that any employee having had one full year of employment with the Corporation shall be paid a full salary for extended illness or disability for such period of time as may be determined by the Board of Directors. The Officers of the Corporation shall report any cases of extended sickness or disability to the Board of Directors, and the Board in determining the period of time that such employee shall continue to receive such full salary shall take into consideration the factors of the said employee's loyalty to the Corporation, his years of employment and the value of his skills to the Corporation. RESOLVED, that the normal retirement age of an employee of the Corporation shall be at the end of the month during which such employee attains age 65, but that the employment of any employee may be extended at the discretion of and for such *33 period of time as may be determined by the Board of Directors. RESOLVED, that the employment of Mr. T. L. Pickle, Jr., as President of the Corporation shall continue until further action of the Board of Directors and that the Corporation shall continue to pay Mr. Pickle his full salary until further action of the Board of Directors. On October 3, 1967, Tax Services' board of directors passed the following resolution: RESOLVED, that the compensation of the President be reduced to $100.00 per week commencing on the 1st day of October, 1967, until such time as he returns to work, at which time the salary shall be reinstated to $250.00. This was the only time Tax Services reduced the salary of an employee while that employee was absent from work on account of illness. The minutes of the May 1, 1967, and October 3, 1967, meetings of Tax Services' board of directors were prepared and written up by the corporation's attorney in 1969. Prior to May 1, 1967, Tax Services had no policy of forcing employees to retire upon reaching a certain age. Its practice was to continue employees of petitioner's class as long as they continued to function 1302 satisfactorily. The May 1, 1967, resolution *34 established 65 as the normal retirement age for employees, unless the board of directors in its discretion permitted an employee to work longer. An exception was made in the case of petitioner. Had petitioner not been ill during 1967 and 1968 he would have been at work performing his function as president. Opinion Petitioner was president and 50-percent shareholder of Tax Services, a small family corporation. He became ill in March 1967, at the age of 67, and as a result was unable to work either for the remainder of 1967 or for any part of 1968. Petitioner was paid his full salary ($250 per week) by Tax Services from the onset of his illness until October 1, 1967, and was paid $100 per week from October 1, 1967, through the end of 1968. Petitioner claims that part of the payments he received from the corporation for the taxable years 1967 and 1968 is excludable from gross income by virtue of section 105(d). Section 105(d) excludes from an employee's gross income to the extent of $100 per week wages or payments in lieu of wages received through accident or health insurance for a period during which the employee is absent from work on account of illness. Such amounts are commonly *35 referred to as sick pay. See, e.g., Estate of Leo P. Kaufman, 35 T.C. 663 (1961), affd. 300 F. 2d 128 (C.A. 6, 1962). Section 105(e) provides, inter alia, that amounts received through an employer's own accident or health plan for employees are to be treated for purposes of section 105(d) as amounts received through accident or health insurance. Section 1.105-5(a) of the regulations provides the following definition of what 105(e) means by a health plan: In general, an accident or health plan is an arrangement for the payment of amounts to employees in the event of personal injuries or sickness. A plan may cover one or more employees, and there may be different plans for different employees or classes of employees. An accident or health plan may be either insured or noninsured, and it is not necessary that the plan be in writing or that the employee's rights to benefits under the plan be enforceable. However, if the employee's rights are not enforceable, an amount will be deemed to be received under a plan only if, on the date the employee became sick or injured, the employee was covered by a plan (or a program, policy, or custom having the effect of a *36 plan) providing for the payment of amounts to the employee in the event of personal injuries or sickness, and notice or knowledge of such plan was reasonably available to the employee. It is immaterial who makes payment of the benefits provided by the plan. For example, payment may be made by the employer, a welfare fund, a State sickness or disability benefits fund, an association of employers or employees, or by an insurance company. Petitioner does not claim that the purported wage continuation payments he excluded from gross income were received through accident or health insurance as such. Rather, he claims that he received the alleged sick pay pursuant to an unwritten accident or health plan for employees within the meaning of section 105(e) and section 1.105-5(a) of the regulations. To prevail, petitioner must establish not only that a valid wage continuation plan existed but also that the plan was in effect prior to his illness. John C. Lang, 41 T.C. 352 (1963); Estate of Leo P. Kaufman, supra. Respondent contends that Tax Services did not have a valid wage continuation plan in effect when petitioner became ill. Alternatively, respondent argues *37 the following points in the event we find that a wage continuation plan did exist: (1) petitioner was beyond retirement age throughout his illness; (2) the wage continuation plan did not contemplate an illness of more than two weeks; and (3) the action taken by the board of directors of Tax Services on October 3, 1967, in effect retired petitioner as of October 1, 1967. Respondent first contends that the number of specific instances when the corporation paid an ill employee prior to petitioner's illness are too few to establish the existence of an unwritten wage continuation plan. Respondent argues that the allowance of sick pay by Tax Services was solely on an ad hoc basis, purely within the discretion of the corporation's board of directors, and that therefore section 105(d) does not apply. See John C. Lang, supra. However, the fact that Tax Services employed only 10 to 12 permanent employees helps to explain why it had faced only one illness of as long as five weeks prior to petitioner's extended illness. Also, the corporation had been in existence less than two 1303 years when petitioner became ill, hardly a period lengthy enough for it to have accumulated *38 extensive experience with ill employees. Furthermore, petitioner's son, vice president of Tax Services, testified that an unwritten wage continuation plan was established at the first meeting of the corporation's board of directors in May 1965. His testimony was sincere, uncontradicted, and credible. Also, none of the corporation's other employees who testified could recall an instance where the corporation had failed to pay a permanent employee who was absent from work on account of illness. All of these witnesses manifested a definite expectation that had they been absent from work due to illness prior to petitioner's illness they would have been paid in full. It is true that the length of time during which an employee would receive sick pay was solely within the discretion of the corporation's board of directors. However, the lack of any clear provision for dealing with extended illnesses does not necessarily negate the existence of a wage continuation plan, although it is a relevant consideration. Cf. Samuel Levine, 50 T.C. 422 (1968). The lack of such a provision has more to do with the length of time during which the petitioner could legitimately claim the benefits *39 of section 105(d), a question considered below. Respondent has introduced no evidence to counter the testimony of petitioner's witnesses. Petitioner's witnesses were worthy of belief and we hold that their testimony has established that Tax Services had in operation prior to petitioner's illness "a program, policy, or custom having the effect" of a wage continuation plan. Sec. 1.105-5(a), Income Tax Regs. The action taken by the board of directors on May 1, 1967, merely put into writing a pre-existing plan. Although the rights of Tax Services' employees under this plan were apparently not enforceable, we have found as a fact that each employee covered by the plan was notified of its existence. Thus it meets the requirements of section 1.105-5(a), Income Tax Regs., quoted in pertinent part, supra. [2]
*40 Respondent's next contention is based on the following language from section 1.105-4 (a)(3)(i)(a) of the regulations: Section 105(d) applies only to amounts attributable to periods during which the employee would be at work were it not for a personal injury or sickness. Thus, an employee is not absent from work if he is not expected to work because, for example, he has reached retirement age. * * * Respondent argues that Tax Services' retirement age was 65, and since petitioner was 67 when he became ill he does not qualify under section 105(d). Section 1.105-4(a)(3)(i)(b), Income Tax Regs., refers to section 1.79-2(b)(3) of the regulations for further definition of the term "retirement age." Section 1.79-2(b)(3) provides four tests for determining retirement age. The first two tests, embodied in subparagraphs (1) and (2) of section 1.79-2(b)(3)(i)(a) of the regulations, apply only to firms which have in effect a written pension or annuity plan and thus do not apply to this case. The third and fourth tests are stated by the regulations as follows: 1304 Sec. 1.79-2(b)(3)(ii) In the absence of a written employee's pension or annuity plan described in subdivision (i) of this *41 subparagraph, retirement age is the age, if any, at which it has been the practice of the employer to terminate, due to age, the services of the class of employees to which the particular employee last belonged, provided such age is reasonable in view of all the pertinent facts and circumstances. (iii) If neither subdivisions (i) or (ii) of this subparagraph applies, the retirement age is considered to be age 65. We feel that the section 1.79-2(b)(3)(ii) test is applicable to this case. [3] Petitioner was the founder, president, and prime mover of Tax Services, which was a small family corporation. It is reasonble to place petitioner in a class of employees by himself, and we do so. The practice of Tax Services with respect to retiring petitioner was clearly to continue his employment as long as he performed his function. The retirement age was certainly greater than 65, since petitioner was still carrying more than a full workload at 67, when he became ill. Cf. William L. Winter, 36 T.C. 14 (1961), affd. 303 F. 2d 150 (C.A. 3, 1962).
*42 Furthermore, respondent concedes in his brief "that an individual should not be denied the benefits of section 105(d) solely because he has passed the normal retirement age. Rev. Rul. 61-192, C.B. 1961-2, 23." Petitioner has established that, but for his illness, he would have been expected at work during 1967 and 1968; petitioner's son testified convincingly to that effect. We hold, therefore, that petitioner had not yet reached retirement age when he first became ill in March 1967. Respondent's third contention is that even if Tax Services did have a valid wage continuation plan, it was limited to two weeks in duration. Respondent relies on the following passage from the minutes of the May 1, 1967, meeting of the board of directors to support his view: "it had been the practice in the past of the corporation to continue an employee at full pay for at least a period of two weeks during any sickness." Respondent seems to ignore the words "at least." Further, we have found as a fact that prior to petitioner's illness Tax Services had fully paid an employee for a five-week absence from work on account of illness. It is reasonable to assume that Tax Services would have *43 been willing to continue in full the wages of its most important executive for a substantially longer period. However, this does not resolve the more basic issue presented by respondent's contention, viz, whether the corporation's wage continuation plan was intended to cope with a 21-month illness, or whether it was designed only to deal with illnesses of much shorter duration. This is a question distinct from our inquiry into whether or not Tax Services had any wage continuation plan. Section 1.105-5(a) of the regulations does not require an exhaustive, comprehensive wage continuation plan. [4] A plan may come within the regulation and yet provide no clear cut criteria for terminating sick pay during an extended illness. As we noted above, Tax Services' wage continuation plan made no provision for extended illnesses other than continuing sick pay at the discretion of the board of directors. This absence of any objective criteria, compounded by the fact that petitioner is the principal shareholder in a family corporation, *44 requires close scrutiny lest the petitioner be allowed to exclude from gross income what are in effect dividends disguised as sick pay. Petitioner must establish that the board of directors would have continued his wages for the full 21 months in question had he not been its principal stockholder. Otherwise, we must hold that the payments made in excess of those which a nonshareholder would have received were in effect dividends rather than wage continuation payments. See Samuel Levine, supra, and Alan B. Larkin, 48 T.C. 629 (1967), affd. 394 F. 2d 494 (C.A. 1, 1968). Petitioner was an extremely valuable employee and under the facts presented to us we feel that the corporation would 1305 have continued the wages of a nonshareholding employee of his stature for some months. However, several factors lead us to the conclusion that a nonshareholding employee would not have received sick pay for as long as 21 months. Tax Services had had no experience with an employee being absent from work due to illness for more than five weeks. It was a small corporation which could ill afford the financial burden of paying one of its 10 or 12 permanent employees *45 for an extended period of time without receiving services in return. Moreover, petitioner falls short of fully satisfying the only criterion which served to guide the directorst discretion in setting the duration of sick pay. Petitioner's son stated that prior to petitioner's illness the corporation simply continued an ill employee's wages "as long as we understood that the person would come back to work." Petitioner has not established that there was even a remote prospect that he would be able to resume work after October 1, 1967. Also, Tax Services reduced petitioner's salary from $250 to $100 per week as of that date, and this was the only time an ill employee's wages had ever been reduced by Tax Services. We view this reduction in salary as a recognition by Tax Services that petitioner would never be able to return to work and that the corporation could no longer afford to pay petitioner's full salary without any prospect of receiving his services in return. We hold, therefore, that the wage continuation payments received by petitioner from the date he fell ill until October 1, 1967, were within the scope of the corporation's wage continuation plan. However, petitioner has *46 not persuaded us that the payments he received from the corporation on and after October 1, 1967, were excludable from gross income under section 105(d). Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
2. This holding is not inconsistent with the results reached in the four principal cases cited by respondent, all of which, while specifically recognizing that section 105 must be given a liberal interpretation, found that the respective petitioners did not receive the alleged sick pay through a bona fide wage continuation plan. In Samuel Levine [Dec. 28,987], 50 T.C. 422 (1968), petitioner, the principal shareholder in a corporation, was ill and absent from work beginning in August 1957, and continuing through the years in issue, 1960-1962. He received sick pay throughout his illness. We held that since other employees of the corporation had received sick pay only for short periods of time, the alleged sick pay received by petitioner for the years 1960-1962 (a period beginning more than two years and four months after he became ill) was paid not because of his employment with the corporation, but because of his shareholdings. If a comparable time sequence were involved in this case we would be forced to the same result. We did not hold in Samuel Levine that there was not a sick pay plan; we held that even if the facts otherwise demonstated the existence of a plan, it could not have legitimately contemplated a 5-year illness. In Estate of Leo P. Kaufman, 35 T.C. 663 (1961), affd. 300 F. 2d 128 (C.A. 6, 1962), we found that petitioner continued to participate actively in his business as a consultant after he became ill, and that the alleged sick pay actually constituted compensation for his services. In John C. Lang, 41 T.C. 352 (1963), petitioner's fellow employees were not specifically notified of their employer's sick pay plan, and the employer's allowance of sick pay to all employees was not an invariable practice and did not offer the employees a definite expectation that they would receive sick pay even during a very brief illness. In Alan B. Larkin, 48 T.C. 629 (1967), affd. 394 F. 2d 494 (C.A. 1, 1968), we did not decide whether or not a plan actually existed, but decided that even if a plan did exist it failed to fit within sec. 105↩ because its purpose was to benefit stockholders and their relatives rather than employees.
3. Petitioner challenges the arbitrariness of section 1.79-2(b)(3)(iii) of the regulations, citing Walsh v. United States, 322 F. Supp. 613↩ (E.D.N.Y. 1970). However, our decision that Sec. 1.79-2(b)(3)(iii) is inapplicable to this case obviates further consideration of this point.
4. Both the regulations and the legislative history indicate that Sec. 105↩ is to be given a liberal reading. See the cases cited in footnote 2, supra.