[Civ. No. 12096. First Dist., Div. One. Oct. 28, 1942.]

ARTHUR W. HOGE, Respondent, v. LAVA CAP GOLD MINING CORPORATION (a Corporation), Appellant.

Butler, Van Dyke & Harris for Appellant.

James Snell for Respondent.

WARD, J.—The defendant appeals from a judgment in favor of plaintiff declaring the latter to be the owner of 6,000 shares of the capital stock of defendant, Lava Cap Gold Mining Corporation, and that he recover the sum of $1,860, dividends declared on said stock. Defendant also appeals from an order denying its motion to strike from plaintiff's

cost bill an item of $360, being traveling expenses of plaintiff's attorney from Grass Valley, California, to New York and return incurred in taking a deposition in the latter place. Both appeals are presented on one transcript.

As appears from the evidence introduced, the facts out of which the suit arose may be stated as follows: Arthur W. Hoge, the plaintiff, a mining engineer residing in the Grass Valley mining district, H. B. Walmsley, a member of the bar of New York state, and R. F. D. LeMon, a promoter, had become interested in a group of gold-mining claims or properties located in said district, and conceived the idea of forming a corporation for the purpose of exploiting them. There were conflicting claims to these properties, debts and defects of title, and Hoge was to assist in clearing these matters up, being more or less familiar with the properties and qualified by experience in such work. Title to them was to be preliminarily vested in LeMon. The entire capital stock of the corporation, consisting of 2,500,000 shares, was to be issued to LeMon in return for a conveyance through him to the corporation of clear title to a portion of the properties, he in turn to put back into the treasury of the corporation 1,000,000 shares, and with the remainder satisfy the claims of various stockholders in prior organizations, pay off various creditors having claims upon them, and divide the balance between Walmsley and himself as compensation for their services prior to organization and thereafter until the corporation should be on a self-sustaining basis. Out of the stock so issued to LeMon it was agreed among the promoters and Hoge that the latter would be given 100,000 shares to take the presidency of the proposed corporation and "straighten out the mess." One of the witnesses testified that Hoge was to accept the presidency and that the stock was to cover his compensation until the mine was on a self-sustaining basis.

The plan was carried out, the defendant corporation was organized, coming into existence on January 14, 1932, its stock was issued as agreed, LeMon was elected to the office of executive vice-president, and active mining operations were begun and have since continued. Hoge, as president, was active in the corporation's affairs, particularly in getting the mining operations under way, in this regard acting as general manager and superintendent. Work was commenced around January 1, 1933, consisting of unwatering a mine, go-

ing down and opening up sample ore bodies, retimbering and putting the mine in condition for operation.

In March, 1933, LeMon, charged with selling the stock of the company to the public, was preparing to apply to the Commissioner of Corporations of this state for a permit to sell. In that connection he addressed a letter to Hoge, in which he stated that he was endeavoring to clean up all ragged ends, and wanted the statement of the company to show no indebtedness whatever if possible. He refers to an item of "bills payable" and says: "This is made up of two $2,000 notes to yourself and Jockmus. Mr. Jockmus has consented to exchange his demand note for Lava Cap stock at 30c or 6,000 shares and I am today sending him Certificate No. 751 for 6,000 shares in payment of his note. Knowing your willingness to keep pace with others in this respect insofar as you can, I am enclosing herewith Certificate No. 752, registered in your name, for 6,000 shares, and I would ask you to mark your note paid and return to me by air mail immediately so that it can be eliminated from the statement. This, with the cancellation of the $25,000 mortgage, gives us a clean slate. I hope to have the mortgage out of the way by April 10th, at which time we can issue our statement and make application for a permit in California."

There were enclosed in this letter two promissory notes payable to Hoge, one executed by the corporation and the other by LeMon himself. Hoge had previously been requested by LeMon to subscribe for stock with the idea— counsel for appellant suggests — that Hoge being recognized in his community as a competent mining engineer, and being president of the company, prospective investors could be more readily induced to subscribe. Hoge had replied that he was unable to do so. As to the letter transmitting to him the stock certificate and notes he testified at the trial that he had no recollection of ever having subscribed for the stock, and regarded the matter as an offer made to him to take and pay for the stock by discounting the company's note and using the proceeds for that purpose—in effect, accepting the stock as an unauthorized gift. He declined to have anything to do with the transaction; and in the following month, LeMon being on a visit to the company's office at Grass Valley, handed back to LeMon the stock certificate, with his name endorsed thereon, and the two notes. A witness, O'Keefe, who at the time of the

trial was secretary of the company, testified that at some time during the year 1933 this certificate was returned to the corporation by LeMon and canceled.

In addition to his activities as president of the defendant, Hoge was interested in a concern known as Hoge Development Company. Some time in the year 1933 prior to July this company was in immediate need of funds. To meet this need Hoge, who as president and manager of defendant was authorized to draw upon the corporation's local bank account, turned over to the development company $6,500 of the defendant's funds. He testified that he regarded the transaction as a loan—although no security was given for it—and that he apprised LeMon of what he contemplated doing. However, after it was done LeMon took strong exception to it, visited Hoge (who was at the time sick in a hospital) and demanded that he replace the funds; also that he and his son (who was assistant treasurer and assistant secretary of appellant) resign their offices, and that Hoge return to LeMon the 100,000 shares given him on the organization of the company. Hoge refused to resign or return the stock.

On LeMon's return to New York toward the end of July a report of the matter was made to the directors of the company, which, with respect to Hoge, at a meeting on August 1, 1933, wherein it appears that Hoge's indebtedness to the company was repaid on July 26th, passed the following resolution: "RESOLVED, that the Vice President be authorized to negotiate with Arthur W. Hoge and Arthur M. Hoge and the Hoge Development Company for the purpose of amicably adjusting any differences that may exist between this Company and them, or any of them, but that no legal action shall be taken in connection therewith, and that such steps as may be necessary to take to protect the interests of this company shall be taken in a careful and diplomatic manner, including the procuring of the resignations, if possible of Arthur W. Hoge as Director and President and Arthur M. Hoge as Assistant Treasurer and Assistant Secretary of the corporation, such resignations to be accepted at such time as this Board of Directors may deem proper.

"FURTHER RESOLVED, that in view of the services rendered to this company by Arthur W. Hoge, his indebtedness to this company for $2,000 for the purchase of 6,000 shares of stock, be and the same hereby is cancelled, and that the said 6,000

shares of stock be delivered to said Arthur W. Hoge as payment for his services.''

It is apparent from the tenor of this resolution that the directors of the company other than LeMon were unaware of the nature of the transaction between LeMon and Hoge above mentioned, or of the situation regarding the stock.

LeMon then returned to California. Hoge at this time was confined to his home—still sick. LeMon got in contact with Hoge junior; informed him that he, LeMon, had been appointed to handle the difficulty between his father and the company as best he could, and handed to him two written resignations, one for his signature and one for his father's. The son signed and undertook to take the other paper to his father. At this interview LeMon, though authorized by the board of directors to do so, made no disclosure of the terms of the resolution under which he was acting, nor did he come in direct contact with Hoge. Hoge later signed the prepared resignation. LeMon went back to New York and made a report to the board of directors, in which however he made no mention of any disposition of the 6,000 shares of stock, confining himself to the matters subsequently, on September 5th, included in the following resolution passed by the board:

''RESOLVED, that WHEREAS this Company has had, and now has, certain claims against Arthur W. Hoge and Arthur M. Hoge and the Hoge Development Company, AND WHEREAS, the said Hoges or the Hoge Development Company has asserted a claim, or claims, against this Company, AND WHEREAS, all matters in dispute between all of said parties have been settled or disposed, except the payment to this company of FOUR HUNDRED FIFTY-EIGHT DOLLARS and THIRTY-NINE CENTS ($458.39) by the Hoges or the Hoge Development Company, it is hereby RESOLVED, that upon receipt of said sum of Four Hundred Fifty-eight Dollars and Thirty-nine Cents ($458.39), this Company exchange general releases with the said Arthur W. Hoge, Arthur M. Hoge and the Hoge Development Company, but that said general releases executed by this Company be not delivered until payment of said sum of Four Hundred Fifty-eight Dollars and Thirty-nine Cents ($458.39) and then only upon delivery of general releases from the Hoges and the Hoge Development Company to this Company.''

In accordance with the above resolution releases were prepared, executed by the corporation and forwarded to the local

attorney for the company at Nevada City, with instructions to exchange releases with Hoge. The releases, however, were never exchanged.

Later Hoge and Walmsley entered into some correspondence, and on October 2, 1933, the latter sent him excerpts from the minutes of the board of directors' meeting of August 1st. This was the first intimation to Hoge that LeMon had been authorized to cancel a purported indebtedness from him to the company of $2,000, and to permit him to retain "as payment for his services" the 6,000 shares of stock assumed by the resolution to be in his possession. It was from this correspondence also that Hoge learned that LeMon had received from the company approximately $10,000 during a two-year period for expenses and drawing account. In a letter to Walmsley dated October 9, 1933, Hoge informed him that he was thinking of putting in a bill to the defendant for nineteen months' salary as president and general manager of the company, and wished to have Walmsley's opinion on the matter before doing so; and in another letter to him dated October 17th, referring to the same subject, he states that the matter of salary was never discussed until the time Jockmus, subsequently president of the company, visited Grass Valley in April, 1933, when both LeMon and Jockmus stated to him that it was their idea that no officer or director of the company was to receive any salary until after the properties went into production, adding: "In view of the above facts, I feel that I am certainly just as entitled to compensation as LeMon was."

On November 27, 1933, Hoge wrote to Jockmus, then president of the company, about the same matter, in which letter he also referred to the stock incident, as to which he said: "I want also to add that when Mr. LeMon was here with you last April, I gave him 6,000 shares of stock properly endorsed and also gave him back his note for $2,000.00 and also gave him back the company note of $2,000.00 whereas I could have paid in my $2,000.00 through my bank and paid for this stock and could in turn cash the company note."

It appears that nothing further was done either about the stock or Hoge's claim for salary until some three years later when, on November 12, 1936, Hoge wrote Jockmus, who was still president of the company, as follows: "I have succeeded, after a period of a little over three years, in getting certified copies of the famous directors' meetings of August 1, 1933, and

September 5, 1933." He further stated that from their reading it was clear to him that none of the directors except LeMon knew the facts, as was apparent from that part of the minutes of the first mentioned date reading: ". . . that in view of the services rendered to this company by Arthur W. Hoge, his indebtedness to this company for $2,000 for the purchase of 6,000 shares of stock, be and the same is hereby canceled, and that the said 6,000 shares of stock be delivered to said Arthur W. Hoge as payment for his services." Hoge further stated that "it was understood that I was to receive a salary as President of the Corporation from the time the Corporation was started, ... . As to what steps I shall take in regard to these matters, I have as yet not decided and I might likewise state that this will depend largely upon what I hear from you within the next ten days." After further personal correspondence between Hoge and Jockmus, the facts were referred to the secretary of the corporation, O'Keefe, who wrote Hoge in part as follows: "The 6,000 shares, of which you speak, is of a different classification in that it was completely a corporate matter and, as such, directly related to your activities as President of Lava Cap Gold Mining Corporation. The delivery of these shares to you was contingent upon your fulfillment of certain obligations and was in direct reference to the finances and other activities. They were not delivered to you." Hoge, in reply to that part of O'Keefe's letter requesting "a general release," replied: "A general release on my part will be given when the company's actions are complied with, but not before. . . . This stock was voted to me in payment for services rendered over three months after it had been given by me to LeMon as referred to in paragraph 4 in my letter to Mr. Jockmus of November 12, 1936. In view of the above facts, which LeMon, of course, knew all about, he acted as Chairman of the Board of Directors on August 1, 1933, and voted along with Messrs. Jockmus, Pendlebury, Walmsley and Mrs. Miller, that the said 6,000 shares of stock should be delivered to me as payment for services rendered. It has not been delivered and, consequently, as above stated, there will not be any release on my part until it is." Upon discussion of the situation by the board of directors, the matter of Hoge's claim was finally referred by the company to its counsel, who thereupon, on April 8, 1937, informed Hoge that they had advised the company the claim

should be rejected. After further correspondence, the complaint herein was filed in July of 1937.

It is not necessary to decide whether respondent obtained title to the certificate for the 6,000 shares of stock at the time and by reason of its issuance in March, 1933. The factual background, however, becomes important in determining whether he became vested with ownership by reason of the above resolution of August 1, 1933, and occurrences thereafter.

Appellant in great measure places the blame for the issuance of the certificate originally upon LeMon, in this regard stating in its opening brief: ". . . in order to accomplish his purpose, LeMon, in violation of every duty he 'owed the appellant corporation, caused to be issued, without any consideration, this disputed certificate for 6,000 shares of stock, and in addition to that infamy caused to be executed, likewise without any consideration whatever, the promissory note of the appellant corporation, payable to respondent upon demand. These two documents he forwarded to respondent. Respondent, however, at that time recognizing his obligation to be honest in the discharge of his duties to appellant, refused to have anything to do with the malodorous transaction."

· There is evidence that the stock upon its delivery by Hoge remained in the possession of LeMon, although it stood on the books of the appellant in the name of respondent, until subsequent to the resolution of August 1, 1933. There is also evidentiary support in the findings of the court that LeMon delivered the stock certificate to appellant for cancellation without the knowledge or consent of respondent, and that the writing of the word "Cancelled" across the face of the certificate was without the knowledge or authority of either respondent or appellant. The evidence of witness O'Keefe, who was working in harmony with LeMon, shows that LeMon delivered the certificate to him and that it was marked cancelled. Whether this was with the approval of respondent is a factual matter determined from all of the surrounding circumstances, but there is evidence that at the time of cancellation the matter was handled by LeMon without the knowledge of either interested party.

▆▆ Whatever occurred prior to August 1, 1933, appellant at that time directed by resolution that the 6,000

shares of stock "be delivered to said Arthur W. Hoge as payment for his services." The court found that respondent had performed certain services of the value alleged, which had not been paid, and that the resolution of August 1, 1933, had been passed and never revoked or rescinded; that delivery of the stock had been demanded by respondent but was refused.

Appellant contends that the resolution of August 1, 1933, vested no title of ownership to the stock in respondent. This resolution, read in its entirety, may be construed to be an offer which, if accepted, constituted the basis of a binding contract. That cancellation of claims should be negotiated through LeMon was simply a matter of convenience. Had the offer been immediately communicated to Hoge, and the cancellation of claims accomplished with the corporation direct, the contract would have been completed. LeMon as an agent of communication was a mere incident. He was neither fair to his fellow directors nor to respondent. Whatever part he played in the negotiations, they did not result in the ultimate purpose of the offer, namely, the cancellation of claims.

Upon the theory that it merely offered or proposed that respondent accept the 6,000 shares of stock as compensation for services rendered, appellant also contends that there was no acceptance of the offer in writing, and that the statute of limitations (Code Civ. Proc., § 337, subd. 1) is applicable.

Specifically, it is appellant's contention that the board of directors intended a complete severance of all connections with respondent, and that cancellation of claims should be effected through the negotiations of LeMon.

The time for the acceptance of the offer was not specified, and therefore remained open for a reasonable time. Acceptance could not be expected until notification of the offer. Appellant's position is that any information given by Walmsley to Hoge relative to the resolution was unauthorized and "in furtherance of his own ends in connection with his war with LeMon." The incident need not be considered further. The offer was still open; the corporation did not rescind or revoke its resolution of August 1st.

Appellant argues that the resolution of August 1st was

rescinded and revoked by that of September 5th. The latter resolution is a declaration that the corporation still held "certain claims" against Hoge and that Hoge "has asserted a claim or claims" against the corporation; that upon the payment by Hoge, his son or the Hoge Development Company of the claim of the corporation, general releases should be exchanged. What claims Hoge still asserted against the company are not enumerated. The claims referred to in the evidence are the salary claim and that for the stock in dispute. Instead of attempting to end the matter, under the provisions of the September resolution, by positive statements further negotiations toward a settlement of the recognized controversy were inferentially approved. That Hoge accepted the company's offer, and demanded delivery of the stock when he finally obtained "certified" or verified copies of the resolutions, is demonstrated by his letter of January 29, 1937, stating: ". . . that the said 6,000 shares of stock should be delivered to me as payment for services rendered. It has not been delivered and, consequently, as above stated, there will not be any release on my part until it is." That a written acceptance was referred to, considered and acted upon by the corporation, is shown by its action in referring the matter to its attorneys for investigation. The acceptance of the offer occurred in 1937. The complaint was filed in July of that year. This also disposes of appellant's claim that the cause of action was barred by the statute of limitations.

 A separate appeal has been taken from an order denying a motion to tax costs, and specifically from an order denying defendant's motion to strike from the cost bill an item covering railroad fare and other expenses of the attorney for plaintiff in traveling from Grass Valley to New York City and return for the purpose, at the request of defendant, of taking Walmsley's deposition. The correctness of the amount is not challenged.

Appellant relies upon section 1032 of the Code of Civil Procedure and the decision in *Moss* v. *Underwriters' Report, Inc.*, 12 Cal. (2d) 266 [83 P. (2d) 503]. In the Moss case, in holding that a party was not entitled to recover as costs the amount expended for a bond premium, it was said: "The term 'costs,' as has been said, means 'those fees and charges which are required by law to be paid to the courts, or some of their

officers, or the amount of which is expressly fixed by law.' (*Blair* v. *Brownstone Oil & Refining Co.,* 20 Cal. App. 316 [128 Pac. 1022].) The words 'necessary disbursements' should be similarly construed. Certainly the statute· does not contemplate that a defendant must pay all of the successful plaintiff's expenses in connection with the litigation. The code authorizes the allowance of costs only, and the inclusion of 'necessary disbursements' in the section requiring one who claims costs to file a memorandum of them does not authorize a litigant to collect from his unsuccessful adversary the amount of any expense which is not allowable as an item of 'costs.' (*Bond* v. *United Railroads,* 20 Cal. App. 124 [128 Pac. 786].)'' The court therein held that the filing by the appellant of a surety bond in connection with which a premium was required was a privilege and not a duty—that a personal bond could have been filed for which no premium would have been required.

In the case before us, the interrogatories of the deposition were propounded orally. In the absence of a showing to the contrary, it may be assumed that it was necessary for respondent, his attorney or someone specially designated to appear and interrogate the witness. (Code Civ. Proc., § 2025½; *Walker Min. Co.* v. *Industrial Acc. Com.,* 35 Cal. App. (2d) 257 [95 P. (2d) 188].) In *San Francisco Gas & Electric Co.* v. *Superior Court,* 155 Cal. 30 [99 P. 359, 17 Ann. Cas. 933], at page 38, the court said: "In the cases to which the law applies each party must take some risk. The party desiring the testimony must take the deposition or run the risk of losing it— the opposing party, if the depositions are taken, must incur the expense of employing counsel to cross-examine, or take the risk of ignoring the proceeding." Appellant imposed a necessary disbursement upon respondent. Whether the presence of the attorney of record was necessary to properly protect the rights of respondent, was a question of fact to be decided by the trial court. (*Lomita Land & Water Co.* v. *Robinson,* 154 Cal. 36 [97 Pac. 10, 18 L. R. A. (N. S.) 1106]; *Welch* v. *Alcott,* 178 Cal. 530 [174 Pac. 34]; *Hughes* v. *Hughes,* 49 Cal. App. 217 [193 Pac. 148].) We are not in accord with appellant's contention that as a matter of law the statute does not authorize the allowance of traveling expenses as costs. The cost incurred in the taking of a deposition is a proper disbursement. (*Eades* v. *Los Angeles Ry. Corpora-*

*tion,* 43 Cal. App. 259 [184 Pac. 884].) ■ The mode of its taking, either by written or oral interrogation, is subject to the direction of the trial court. (*Hopkins* v. *Superior Court,* 105 Cal. App. 133 [286 Pac. 1053].) If the deposition is taken by oral interrogatories it is generally necessary that someone appear. ■ The statute specifically provides for traveling expenses, after proper notice given, upon a failure to take a deposition, except for certain designated reasons. (Code Civ. Proc., § 2025½.) If traveling expenses may be allowed when the deposition is not taken, we conclude that such an expense may be a necessary disbursement when the deposition is taken. The Legislature could not have reasonably approved the provision found in section 2025½ except upon the assumption that a deposition actually taken in compliance with the code provisions was, subject to the discretion of the court in fixing the amount, chargeable as a necessary disbursement. In *Ott* v. *Hentall,* 70 N. H. 231 [47 Atl. 80, 51 L. R. A. 226], in construing a statute similar to section 2025½ relative to traveling expenses of an attorney, the court said (47 Atl., p. 82) : "Under the previous statutes on the subject the remedy of a party aggrieved by a failure to take a deposition was an action on the case. (Rev. St. c. 188, sec. 22; Gen. Laws, c. 229, sec. 10; *Powers* v. *Hale,* 25 N. H. 145.) Now he is not required to bring a separate action, but may be allowed as costs an equitable sum for actual travel, and have judgment therefor in the action in which the deposition was to be taken." In *Moss* v. *Underwriters' Report, Inc., supra,* the filing of a "surety" bond was a privilege. It was there held in effect that the trial court abused its discretion in approving as "costs" the amount of a premium voluntarily paid a surety company. In the present case, so far as the record shows, the disbursement by the attorney of record in traveling to the state of New York to appear for respondent in the taking of a deposition, was imposed upon the latter by appellant. (*San Francisco Gas & Electric Co.* v. *Superior Court, supra.*) We must assume in the face of the record that the trial court correctly decided that the presence of the attorney of record was necessary to protect the rights of respondent.

It is ordered that the judgment, in so far as it relates to dividends declared on the stock awarded plaintiff, is reduced by an amount of $300, the aggregate of such dividends declared prior to January 29, 1937, the date Hoge became

owner of the stock; as so modified the judgment is affirmed, respondent to recover costs.

Peters, P. J., and Knight, J., concurred.

A petition for a rehearing was denied November 27, 1942, and appellant's petition for a hearing by the Supreme Court was denied December 22, 1942.