**LEWIS AND TAYLOR, INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 24656.**

United States Court of Appeals, Ninth Circuit.

Aug. 18, 1971.

Herman P. Scampini, Jr. (argued), Eugene J. Brenner, of Janin, Morgan & Brenner, San Francisco, Cal., for appellant.

Gordon S. Gilman (argued), K. Martin Worthy, Chief Counsel, Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Elmer J. Kelsey, Kenneth L. Gross, of Dept. of Justice, Washington, D. C., for appellee.

Before HAMLEY and CHOY, Circuit Judges, and JAMESON, District Judge *.

* Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

CHOY, Circuit Judge:

Lewis and Taylor, Inc., a California corporation, appeals from an adverse ruling by the Commissioner of Internal Revenue, affirmed by the Tax Court of the United States [1] holding the corporation liable for federal taxes due on $7,191.87 which the corporation had paid to the estate of Robert S. Abrons, a long-term employee subsequent to his death allegedly as additional compensation due Abrons. The Commissioner had ruled that the sum in question had been paid by the corporation to Abrons' estate in partial payment for the repurchase of 50 shares of stock in the corporation held by Abrons at the time of his death, and was in no sense employment compensation. We reverse.

Jurisdiction is conferred upon this court by Section 7482 of the Internal Revenue Code of 1954.

Lewis and Taylor, Inc., is a small family-owned corporation formed in 1945 by Messrs. Taylor and Lewis. In 1947 it employed Abrons as office manager at an annual salary of $2,700, which was raised to $7,800 in 1958, with annual bonuses commencing in 1953. Abrons became a stockholder in 1952 when all stockholders executed a buy-sell agreement under which the surviving stockholders would purchase pro rata the stock of any stockholder who died. Life insurance policies were purchased to partially fund the agreement. A trustee held all the stock and the life insurance policies, and was named beneficiary of the policies. Certain modifications in insurance coverage were made by the stockholders between 1952 and the death of Abrons on April 7, 1961. An agreement dated June 21, 1956, set forth a formula according to which the value of each of the common shares was to be calculated.

Upon Abrons' death, negotiations were commenced by the corporation to pay his estate for his 50 shares of stock. At this time, there were outstanding a total of 325 common shares, 275 held by members of the Lewis or Taylor families. Shortly after Abrons' demise, the surviving stockholders executed a new buy-sell agreement dated June 1, 1961, incorporating a stock valuation formula, having been advised that the 1956 agreement was void due to the lapse of the insurance policies partially funding it.

On June 12, 1961, the corporation made an offer to Abrons' executor to purchase the 50 shares for $17,191.87 (computed according to the agreed formula), which was accepted by the executor subject to approval by the probate court in which Abrons' estate was pending probate. The offer was solemnized by written agreement on September 29, 1961, but its approval by the probate court was never obtained.

Instead, a new agreement was entered into between Abrons' executor and the corporation on December 4, 1961, which provided that $10,000 would be paid for the 50 shares and $7,500 [2] as additional deferred employment compensation because a "moral obligation" was recognized by the corporation to more adequately compensate the underpaid Abrons. This second agreement was eventually confirmed by the probate court in January 1962. The appellee Commissioner asserts that designating the $7,500 as employment compensation was in reality nothing more than a tax dodge to enable the corporation to list it as a business expense and pay less taxes. The appellant asserts, on the other hand, that it and the estate were free to alter the transfer agreement as they wished; that $10,000 more accurately reflects the value of the stock purchased by it; that the post-mortem payment made to

---

1. The opinion of the Tax Court is reported at 1969-P-H Tax Court Memo ¶ 69,082.

2. The difference of $308.13 between this $7,500 and the $7,191.87 on which the Commissioner assessed the additional taxes, had been contributed to cover increased income taxes to the estate resulting from the recasting of the transaction. The Commissioner recognized the $308.13 as a deductible expense to the taxpayer.

Abrons' estate as compensation for past services is a deductible expense under the Internal Revenue Code; and that if the corporation concomitantly derives a tax saving, the Commissioner should not complain.

Uncontradicted evidence was presented that the value of the stock did not exceed $10,000. The Crocker-Anglo National Bank, executor of the estate of Abrons regarded $9,500 as "generous" but valued it at $10,000 in the probate inventory; Peter D. Costigan, a stockbroker with experience in stock valuation appraised it at $8,938; the taxpayer and its accountant fixed its book value at $9,337.50; and the State Inheritance Tax appraiser valued it at $10,000.

■ The Commissioner produced no evidence relating to the value of the stock. As a general rule, uncontradicted testimony of an issue of fact must be followed unless inherently unbelievable or the demeanor of the witness raises a doubt as to his sincerity. Grace Brothers, Inc. v. Commissioner (9th Cir. 1949), 173 F.2d 170; Factor v. Commissioner (9th Cir. 1960), 281 F.2d 100. Here, the evidence on value presented by the taxpayer was not unbelievable and the trial judge who heard the case to completion of trial was unable to complete the assignment whereupon another judge was assigned to make the findings of fact and opinion, so the element of the trial judge's observation of the demeanor of witnesses is absent.

■ The December 4, 1961 agreement conformed to the economic reality of the transaction. In Peter Pan Seafoods, Inc. v. United States (9th Cir. 1969), 417 F.2d 670, we held that where a transaction has economic substance and is economically realistic, it should be recognized for tax purposes, and the fact that a transaction is so arranged that the tax consequences are highly favorable to one of the parties affords the Commissioner no license to recast it into one of less advantage. Gyro Engineering Corporation v. United States (9th Cir. 1969), 417 F.2d 437. See also Edwards v. Commissioner (10th Cir. 1969), 415 F.2d 578, 582, where the court said:

"It is of course true that the contractual form of a transaction cannot control the imposition of tax liability when the realities of the transaction show that form does not represent a bona fide and actual agreement. But it is equally true that the form of a contract is the considered and chosen method of expressing the substance of contractual agreements between parties and the dignity of contractual right cannot be judicially set aside simply because a tax benefit results either by design or accident. Form, absent exceptional circumstances, reflects substance."

■ When the appellant discovered subsequent to the original agreement that tax advantages would accrue by a realistic reevaluation of the stock with a partial designation of the sum offered as additional compensation, the parties to the transaction had a right to abandon the prior agreement and enter into another, there being no fraud upon the government in so doing.

■ It is well settled that a taxpayer has the legal right to minimize, or, indeed, altogether avoid tax liability. Gregory v. Helvering, Commissioner of Internal Revenue (1935), 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596.

■ The Commissioner contends that the evidence is weak that Abrons was so undercompensated during his 14 years of continuous tenure with the appellant that we should not accord credence to the appellant's claim that it felt honor-bound to extend belated post-mortem compensation to his estate; still, it was the only evidence proffered at trial, and has probative value supporting appellant's contention.

We note rulings of the Commissioner that a "plan" is not necessary for making post-mortem salary payments to a widow or heirs in recognition of the services rendered by a decedent during his lifetime, and that such compensation may be deducted by a corporate employ-

er as ordinary and necessary business expense under Section 162(a) (1), Internal Revenue Code of 1954. For the compensation to be deductible, it need only be for a limited period and be reasonable in amount. See Rev.Rul. 54–625, 1954–2 Cum.Bull. 85; I.T. 4027, 1950–2 Cum.Bull. 9; and I.T. 3329, 1939–2, Cum.Bull. 153 in which the Commissioner ruled:

> "When the amount of the salary of an officer or an employee is paid for a limited period after his death to his widow or heirs, in recognition of the services rendered by the individual, such payment may be deducted."

■ We agree, and we reassert that if there was a good business reason to amend the initial agreement, it is not for the Commissioner to insist that the abandoned agreement be adhered to merely because it allows a larger tax return to the United States.

We see no breach of fiduciary duty on the part of the bank-administrator of the decedent's estate in acquiescing in the recasting of the transaction, which resulted in no lesser gain to the estate.

We find it immaterial that when Taylor, another officer-stockholder of the appellant corporation, died in 1965, four years after Abrons, Taylor's estate received about $400 per share for his stock but no post-mortem compensation. He was the principal officer and fifty percent stockholder, and his estate could command a premium for his block of stock. Moreover, it is purely conjectural and speculative in the absence of evidence thereon to equate Taylor's circumstances with those affecting Abrons since Taylor's compensation during employment was significantly higher than Abrons', and the corporation's business position could have substantially changed between 1961 and 1965.

Substance rather than form should control in matters of this nature (as both the government and the taxpayer acknowledge in their briefs). Granted the established fact that the value of the subject stock did not exceed $10,000, the Commissioner exalts form over substance in attempting to hold the taxpayer to the agreement which preceded the ultimate, more realistic agreement of December 4, 1961.

Reversed.