AMERICAN FOUNDRY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3600–71, 3601–71, 6479–71, 6480–71.   Filed November 13, 1972.

---

[1] The following cases are consolidated herewith: Katie Meaglia and Domenic Meaglia, docket Nos. 3601–71 and 6480–71.

*Robert H. Wyshak* and *Lillian W. Wyshak*, for the petitioners.
*Richard H. Gannon*, for the respondent.

QUEALY, *Judge:* Respondent has determined deficiencies in income taxes from the petitioners for the years specified as follows:

| Petitioner | Docket No. | Taxable year | Deficiency |
|---|---|---|---|
| American Foundry | 3600-71 | 1962 | $33,282.65 |
| | | 1963 | 5,879.09 |
| | | 1964 | 18,176.14 |
| | | 1966 | 1,361.08 |
| | | 1967 | 6,125.30 |
| American Foundry | 6479-71 | 1968 | 36,588.72 |
| | | 1969 | 20,864.10 |
| | | 1970 | 31,751.36 |
| Katie Meaglia and Domenic Meaglia | 3601-71 | 1965 | 984.29 |
| | | 1966 | 8,914.64 |
| | | 1967 | 7,522.08 |
| Katie Meaglia and Domenic Meaglia | 6480-71 | 1968 | 2,099.33 |
| | | 1969 | 7,855.58 |
| | | 1970 | 2,479.45 |

The deficiencies determined to be due from American Foundry for its taxable years 1962, 1963, and 1964 are due solely to the disallowance of net operating losses carried back from its taxable years 1965, 1966, and 1967. Our disposition of the issues for decision in the later years will resolve the tax liability for 1962, 1963, and 1964 and will be reflected in the Rule 50 computation.

Concessions having been made by the parties, the issues remaining for our decision are as follows:

(1) Whether payments of $23,082 to Domenic Meaglia in each of the years 1965 to 1970, inclusive, should be included in gross income by Domenic Meaglia and whether such payments are deductible by American Foundry.

(2) Whether the payment of Domenic Meaglia's medical expenses in each of the years 1965 to 1970, inclusive, should be included in gross income by Domenic Meaglia, and whether such payments are deductible by American Foundry.

(3) Whether the amount of $18,000 per year paid to a shareholder-employee of American Foundry was reasonable compensation, deductible by the corporation, in each of the years 1965 to 1970, inclusive.

(4) Whether American Foundry is entitled to a deduction of $2,400

per year for the use of an office in the home of its majority shareholder in each of the years 1965 to 1970, inclusive.

### FINDINGS OF FACT

American Foundry (hereinafter sometimes referred to as the company) is a corporation organized in 1949 under the laws of the State of California. It maintains its books and records on the accrual basis of accounting and reports its income on a fiscal year basis ending July 31. Its Federal income tax returns for the taxable years here in issue were timely filed with the district director of internal revenue at Los Angeles, Calif. At the time of the filing of the petitions herein, American Foundry's principal offices were located in San Marino, Calif.

Domenic Meaglia and Katie Meaglia (hereinafter sometimes referred to as petitioners) are husband and wife who at the time the petitions herein were filed were residents of San Marino, Calif. They report their income on the cash receipts and disbursements method of accounting using a fiscal year ending March 31. Their joint Federal income tax returns for the years here in issue were filed with the district director of internal revenue at Los Angeles, Calif.

Prior to its incorporation, American Foundry was operated initially as a partnership and thereafter as the sole proprietorship of Domenic Meaglia. The company was incorporated in July of 1949 and its net worth at that time was as follows:

| | |
|---|---:|
| Capital stock | $100,000.00 |
| Paid-in surplus | 14,864.62 |
| Total | $114,864.62 |
| Cash paid to D. Meaglia's brother's estate for one-half of goodwill | 5,319.17 |
| Independent professional appraisal of fair market value of machinery and equipment in excess of tax cost basis, as recorded in books | 158,855.74 |
| Total adjusted net worth | 279,039.53 |

The following schedule reflects American Foundry's sales and net taxable income (without reference to net operating loss carryovers or carrybacks) and retained earnings, as reported on its income tax returns for the years indicated:

| TYE July 31— | Sales | Net income |
|---|---:|---:|
| 1958 | $1,787,867 | $87,772.88 |
| 1959 | 2,377,510 | 74,966.15 |
| 1960 | 2,526,620 | 81,193.99 |
| 1961 | 2,599,390 | 26,996.42 |
| 1962 | 3,217,937 | 68,507.44 |
| 1963 | 3,472,983 | 26,599.21 |
| 1964 | 3,689,236 | 59,566.03 |
| 1965 | 2,939,143 | (81,749.66) |
| 1966 | 2,687,700 | (67,948.15) |
| 1967 | 2,666,215 | (46,542.58) |
| 1968 | 3,400,490 | 19,515.66 |
| 1969 | 3,591,271 | (18,441.02) |
| 1970 | 3,385,115 | 1,688.40 |

During the years here pertinent, Domenic and Katie Meaglia owned 79½ percent of American Foundry's one outstanding class of common stock. The remaining 20½ percent was owned equally by Domenic's daughters, Jean Meaglia Shives and Virginia Sbicca.

During the years in question, the officers of American Foundry were:

| | |
|---|---|
| Domenic Meaglia | President |
| Katie Meaglia | Vice president |
| Jean Meaglia Shives | Secretary-treasurer |
| Clyde Shives | First vice president |
| Pete Meaglia | Second vice president and superintendent of foundry |

Clyde Shives was married to Jean Meaglia Shives in May of 1963. Prior to that time, he was not related to the Meaglia family in any way. Pete Meaglia is Domenic Meaglia's brother.

On October 23, 1957, the board of directors of the corporation passed the following resolution:

BE IT RESOLVED: that as of October 23, 1957, officers and dependents to the extent not covered by existing insurance that medical expenses be payed [sic] by the corporation as permitted by the Medical Section of Internal Revenue Code # 105-B.

Shortly before the adoption of the foregoing resolution, 10 of the salaried employees of American Foundry, including Jean Meaglia, Clyde Shives, and Pete Meaglia, purchased a group medical and health insurance policy at their own expense. Domenic and Katie Meaglia did not purchase such a policy. With one minor exception in an earlier year, the sole persons deriving any benefit from the above resolution were Domenic and Katie Meaglia, all of whose medical expenses were paid by the corporation. Clyde and Jean Meaglia Shives, both corporate officers, incurred medical expenses in 1966 of $3,548.51, of which $1,949.20 was not reimbursed by their insurance, and $2,441.47 in 1969, of which $1,691.76 was not reimbursed by their insurance. Clyde Shives testified that he understood that the provisions of the resolution did not cover himself and that it was intended just for Domenic.

On December 10, 1961, Domenic Meaglia suffered a cerebral thrombosis, commonly referred to as a stroke. As a result thereof, Domenic has suffered paralysis of his right side and the loss of most of his faculties. He is constantly attended by a nurse and for the most part confined to his bed or wheelchair.

During his taxable years ending March 31, 1965 through 1970, inclusive, Domenic Meaglia's medical expenses were paid by American Foundry as follows:

| Year ending | Amount | Year ending | Amount |
|---|---|---|---|
| 3/31/65 ---------------- | $21, 833. 29 | 3/31/68 ---------------- | $35, 701. 23 |
| 3/31/66 ---------------- | 34, 457. 91 | 3/31/69 ---------------- | 38, 347. 45 |
| 3/31/67 ---------------- | 32, 541. 94 | 3/31/70 ---------------- | 39, 475. 47 |

These amounts were claimed as deductions on the corporate returns of American Foundry and were excluded from the gross income of Domenic and Katie Meaglia in each of the years in question.

Since its incorporation, with the exception of the years 1950 and 1951, Domenic Meaglia's salary from American Foundry has been in excess of $20,000. Commencing with the taxable year ending June 31, 1957, and during all subsequent years here in issue, he has received $23,082 from the corporation. From its fiscal year 1950 to fiscal 1962, American Foundry's total sales rose from approximately $879,000 to in excess of $3,217,000 under Domenic's direction and control.

On January 25, 1962, a special meeting was held by the board of directors of American Foundry at which Domenic Meaglia, Katie Meaglia, Jean Meaglia, and Virginia Sbicca were present. At that meeting, the following resolution was passed:

RESOLVED: that in view of the low salary received by the president since the formation of this corporation his successful single-handed development of the of the [sic] corporation's business and in view of his continued service to the corporation in a limited capacity, that his present salary be continued through the next fiscal year.

On June 27, 1963, the board of directors once again met and passed the following resolution:

RESOLVED: that this corporation is to continue the established salary of Dominic [sic] Meaglia, President, through the next fiscal year, July 1963 to August 1, 1964, at which time it would be reviewed again. (Reference resolution made at the January 25th, 1963 meeting.)

Domenic continued to receive $23,082, in each of the years in question. Since the onset of his illness, Domenic Meaglia has been unable to provide any service to the corporation as an employee, although the minutes, which bear his signature, do reflect that he was present at the board of directors meetings.

Jean Meaglia Shives has been the corporation's secretary-treasurer since it was founded and served in her father's stead following his stroke. After graduating in 1946 from the University of Southern California with a degree in business administration, she went to work at American Foundry, learning the business under her father's tutelage. During the years prior to Domenic's stroke, she often filled in while he was on vacation or attending business conferences away from the office. Following her father's stroke, she exercised the bulk of the responsibilities formerly handled by him and engaged in both the day-to-day operation of the business and its long-range planning. In 1964,

following her marriage to Clyde Shives, who had been with the company since 1953, at his request, she discontinued her full-time engagement at the factory and set up a room in her home as an office. During the years following 1964, she spent approximately 6 hours a day at the factory, 2 or 3 days a week. Clyde also brought home work for her on frequent occasions.

Commencing with American Foundry's taxable year 1964, Jean Meaglia Shives' salary was $18,000, and she has continued to receive that amount during each of the years before this Court.[2] Commencing with American Foundry's taxable year ending July 31, 1965, the respondent has disallowed as a deduction to American Foundry any amount in excess of $5,000 as unreasonable compensation to Jean Meaglia Shives.

On January 2, 1963, the board of directors passed a resolution which stated that due to the fact that the president's illness had required much additional work on the part of all the officers actively engaged in the everyday operations of the factory, Clyde E. Shives be designated as executive vice president with a commensurate raise in salary to $2,000 per month.[3]

During all of the years in question, Katie Meaglia has maintained in her home an office consisting of a conference table, filing cabinet, and desk which were used at least once a week for meetings of the officers, directors, and advisers of the corporation. American Foundry has never accrued any liability on its books, paid any sum, or deducted any amount for the maintenance of this office in the home of Domenic and Katie Meaglia.

OPINION

*Continued Payment of Salary*

Petitioners first contend that amounts received from American Foundry's continued payment of Domenic's annual salary of $23,082 should be excluded from his gross income under section 104(a)(1),[4] which provides, in material part:

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) IN GENERAL.—Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—

---

[2] Prior to 1964, Jean Meaglia Shives' salary was less than $18,000, but total compensation paid her, including bonuses, was in excess of $25,000 in 1962 and $28,000 in 1963.

[3] The record is unclear as to what Clyde Shives' salary had been prior to this resolution. He received total compensation, including bonuses, in the amounts of $13,760, $14,910, $31,410, $32,337, and $39,000 for the years ending July 31, 1959, through July 31, 1963, respectively.

[4] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

(1) amounts received under workmen's compensation acts as compensation for personal injuries or sickness;

Petitioners argue that the payments here made were "in the nature of" or "in lieu of" workmen's compensation, citing numerous authorities supporting their proposition that the illness suffered by Domenic was compensable under the California Labor Code. The petitioners' preoccupation with this argument and respondent's lengthy rebuttal thereof are both unwarranted.

Even assuming that Domenic's illness would have been compensable under the California Act, we are at a loss to understand how these payments can be said to have been made under any workmen's compensation act, as required by the clear language of section 104(a) (1), or "under a statute in the nature of a workmen's compensation act" as permitted by section 1.104–1(b) of the Income Tax Regulations.

Petitioners do not assert that American Foundry was required to make any payments to Domenic as a self-insurer under section 3700 of the California Labor Code (West 1955) or any other provision of that Act and admit that a claim could have been made, if at all, against the insurer. Further, the amounts that were paid far exceeded the amount which would have been recoverable under workmen's compensation and the payments were reported by the corporation and by Domenic as salary on their respective returns. From the facts, the conclusion is inescapable that the continuation of Domenic's salary was not intended to and did not in fact constitute payments for personal injury or sickness under a workmen's compensation act or a statute in the nature of a workmen's compensation act as required by the statute or the regulations. Accordingly, the question of whether Domenic's sickness was incurred in the course of employment is moot.

Petitioners have shown us no case which would lead us to conclude otherwise and the revenue rulings [5] they cite further support our finding.

Alternatively, petitioners next argue that the continued payment of salary qualifies for exclusion from Domenic's gross income under the provisions of section 105.[6]

---

[5] Rev. Rul. 68–10, 1968–1 C.B. 50; Rev. Rul. 72–291, 1972–1 C.B. 36.

[6] Sec. 105 provides, insofar as it is pertinent to this issue:

SEC. 105. AMOUNTS RECEIVED UNDER ACCIDENT AND HEALTH PLANS.

(a) AMOUNTS ATTRIBUTABLE TO EMPLOYER CONTRIBUTIONS.—Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in gross income of the employee, or (2) are paid by the employer.

*       *       *       *       *       *       *

(c) PAYMENTS UNRELATED TO ABSENCE FROM WORK.—Gross income does not include amounts referred to in subsection (a) to the extent such amounts—

(1) constitute payment for the permanent loss or loss of use of a member or function

Footnote continued on following page.

238

Subject to limitations not here material, section 105(d) excludes from the gross income of the recipient, amounts which constitute wages or payments in lieu of wages for a period during which the employee is absent from work on account of sickness. Section 105(c) provides a similar exclusion of amounts constituting payment for the permanent loss of a function of the body which are computed with reference to the nature of the injury and without regard to the period of absence from work.

Assuming *arguendo*, that the payment of Domenic's salary might otherwise qualify under one of these subsections, a fundamental prerequisite to the exclusion under either of them is that the amounts be paid pursuant to an accident or health plan for employees. See secs. 1.105-4(a)(2)(i) and 1.105-5(a), Income Tax Regs.; *John C. Lang*, 41 T.C. 352 (1963). While we recognize that the *Lang* case dealt only with section 105(d), the reasoning therein is equally applicable to section 105(c). A plan for employees is essential to the allowance of the exclusion under either subsection.

Section 1.105-5(a) of the Income Tax Regulations provides guidelines for determining whether a "plan" exists:

*In general*, an accident or health plan is an arrangement for the payment of amounts to employees in the event of personal injuries or sickness. A plan may cover one or more employees, and there may be different plans for different employees or classes of employees. An accident or health plan may be either insured or noninsured, and it is not necessary that the plan be in writing or that the employee's rights to benefits under the plan be enforceable. However, if the employee's rights are not enforceable, an amount will be deemed to be received under a plan only if, on the date the employee became sick or injured, the employee was covered by a plan (or a program, policy, or custom having the effect of a plan) providing for the payment of amounts to the employee in the event of personal injuries or sickness, and notice or knowledge of such plan was reasonably available to the employee. It is immaterial who makes payment of the benefits provided by the plan. * * *

Despite the liberal interpretation given the statute by the regulations, in this case we can find no "plan." The corporate resolutions of January 25, 1962, and June 27, 1963, set out in our Findings, certainly

---

of the body, or the permanent disfigurement, of the taxpayer, his spouse, or a dependent (as defined in section 152), and

(2) are computed with reference to the nature of the injury without regard to the period the employee is absent from work.

(d) WAGE CONTINUATION PLANS.—Gross income does not include amounts referred to in subsection (a) if such amounts constitute wages or payments in lieu of wages for a period during which the employee is absent from work on account of personal injuries or sickness; but this subsection shall not apply to the extent that such amounts exceed a weekly rate of $100. * * *

(e) ACCIDENT AND HEALTH PLANS.—For purposes of this section and section 104—

(1) amounts received under an accident or health plan for employees, and

(2) amounts received from a sickness and disability fund for employees maintained under the law of a State, a Territory, or the District of Columbia,

shall be treated as amounts received through accident or health insurance.

do not evidence the existence of any plan for the payment of amounts by reference to the nature of the injury and as a matter of fact indicate the contrary. Those resolutions do, however, indicate the intention to continue Domenic's salary, but unfortunately do no more. They do not prove the existence of a "plan." They were passed after Domenic's illness, see *Samuel Levine*, 50 T.C. 422 (1968), and do not purport by their terms to cover any other employee.

Nor has the existence of any "program, policy, or custom having the effect of a plan" been established. No evidence was adduced to show a custom of paying benefits which might otherwise qualify under section 105(c), and without some corroboration, we are not persuaded solely by the testimony of Domenic's daughter that American Foundry had a custom or policy of continuing the salaries of its employees in the case of illness which would qualify under section 105(d). Whatever policy or custom there may have been provided for no more than ad hoc benefit payments, *Estate of Leo P. Kaufman*, 35 T.C. 663 (1961), affd. 300 F. 2d 128 (C.A. 6, 1962), and did not have the effect of a plan. As we held in *John C. Lang*, *supra* at 356:

> A plan [or a program, policy, or custom having the effect of a plan] presupposes a predetermined course of action under prescribed circumstances, and a plan, for purposes of section 105(d), must do more than anticipate the favorable exercise of discretion by the employer when sickness arises; * * *

Accordingly, we hold that no plan existed under either section 105(c) or 105(d) which would permit the exclusion of any portion of Domenic's annual salary; nor was there any program, policy, or custom having the effect of a plan which would do so.

Petitioners' final position with respect to the payment of Domenic's salary throughout the years in question is that it was intended to compensate for deficiencies in payment for services received by the corporation from Domenic and Katie Meaglia in earlier years and from Katie alone since Domenic's stroke. There is no question but that an employer may pay compensation as recognition for undercompensated past services, *Lucas* v. *Ox Fibre Brush Co.*, 281 U.S. 115 (1930), and that such payments are deductible by the employer so long as they are reasonable in amount. *Lewis and Taylor, Inc.* v. *Commissioner*, 447 F. 2d 1074 (C.A. 9, 1971).

We do not doubt that the services rendered by both Domenic and Katie in the early years of American Foundry's existence may have been worth more than they received. However, the fact of undercompensation alone is not enough. The amount by which they were undercompensated must be shown for any deduction to be allowed.[7] The record before us is devoid of any information upon which a determina-

---

[7] See, e.g., *Dixo Co., Inc.*, 27 T.C. M. 644 (1968).

tion of the amount by which Katie may have been undercompensated can be based. Further, we cannot say with certainty that Katie was undercompensated. At the same directors meeting where it was voted to continue Domenic's salary, held January 25, 1962, the corporation passed another resolution stating:

RESOLVED: that in view of the many years of service to the corporation without compensation in order for it to achieve a strong financial position and in view of additional services to be required in the future, that this Vice-President [Katie Meaglia] receive a salary of $100.00 per month effective from the date of the president's illness.

From the foregoing, it is apparent that the corporation was aware of Katie's past contributions to and her future role in the corporation and took appropriate action. We decline to substitute our judgment for that of the directors and hold that no part of the annual payment of $23,082 paid to Domenic can be attributed to past or present services rendered by Katie Meaglia.

Domenic Meaglia's salary has been in excess of $20,000 in each year since 1952 with one exception [8] and has been fixed at $23,082 since 1957. The continuation of that salary was expressly made "in view of the low salary received by the president * * * and in view of his continued service to the corporation in a limited capacity." At the trial, the parties agreed that the range of reasonable salaries for Domenic's services in the years prior to his stroke would have been between $20,000 and $50,000 per annum. We also agree and feel that Domenic was undercompensated for his services at least in the years immediately preceding his stroke. From the range stipulated by the parties, the "average reasonable salary," exclusive of fringe benefits, for Domenic's services would be $35,000. We can find no justification in the record for any greater amount, nor can we find that he was undercompensated prior to 1956. Assuming, therefore, that in the 5 years prior to his stroke Domenic was underpaid by approximately $12,000 per year, we find that no more than $60,000 of the salaries paid him in the years after his illness can properly be regarded as compensation for past services. Domenic's stroke occurred on December 10, 1961. Of the $23,082 paid by the corporation in its fiscal year 1962, approximately $14,000 is attributable to the period from the onset of Domenic's stroke until July 31, 1962. The remainder of the $60,000 is made up by the receipt of his salary in the following 2 years.

Accordingly, to the extent that Domenic Meaglia can be said to have been undercompensated in the years preceding his illness, he was repaid by the end of American Foundry's fiscal year 1964. The respondent does not here seek to disallow any deductions to the corpora-

---

[8] In 1956, a year in which American Foundry suffered a strike, Domenic's salary was $19,235.

tion for Domenic's compensation prior to the end of that year and rightly so.

To summarize, the receipt of $23,082 by Domenic in each of the years in issue is not excludable from his gross income as payment under a workmen's compensation act as provided by section 104(a)(1); is not excludable either as payment for permanent loss of a function of the body under section 105(c), or for "sick pay" under section 105(d); and is neither reasonable compensation for his past services nor for the past or present services of his wife, Katie. Therefore, the amounts received, to the extent of American Foundry's earnings and profits,[9] constitute the payment of dividends to Domenic Meaglia by American Foundry and are therefore not deductible by the corporation as ordinary and necessary business expenses under section 162(a) in any of its years 1965 to 1970, inclusive.

### Payment of Medical Expenses

Pursuant to its corporate resolution of October 23, 1957, American Foundry paid the medical expenses of Domenic Meaglia in each of the years in issue. The following amounts were deducted on the company's returns for the payment of those expenses:

| Taxable year | Amount deducted | Taxable year | Amount deducted |
|---|---|---|---|
| 7/31/65 | $32,749.93 | 7/31/68 | $33,508.05 |
| 7/31/66 | 35,311.91 | 7/31/69 | 38,534.50 |
| 7/31/67 | 31,156.95 | 7/31/70 | 39,945.87 |

None of those amounts were included in gross income on the returns of Domenic and Katie Meaglia.

The respondent has determined that the payment of Domenic's medical expenses constituted a nondeductible constructive dividend to him from American Foundry and that such amounts are includable in Domenic's gross income.

Petitioners first contend that, as in the case of the salary continuation, the payment of Domenic's medical expenses was made "in lieu of" workmen's compensation and is therefore excludable from his gross income under section 104(a)(1). For the same reasons we previously cited with respect to his salary payments, the payment of Domenic's medical expenses does not qualify for the section 104(a)(1) exclusion.

Petitioners next argue that the expenses qualify for exclusion under section 105(b), which provides a third exception to the operation of section 105(a), in addition to those provided by sections 105(c) and 105(d) discussed above:

SEC. 105(b). AMOUNTS EXPENDED FOR MEDICAL CARE.—Except in the case of amounts attributable to (and not in excess of) deductions allowed under section

[9] The amounts received will be included in Domenic's gross income to the extent and in the manner provided by sec. 301(c).

213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include amounts referred to in subsection (a) if such amounts are paid, directly or indirectly, to the taxpayer to reimburse the taxpayer for expenses incurred by him for the medical care (as defined in section 213(e)) of the taxpayer, his spouse, and his dependents (as defined in section 152).

The requirement that the payments be made pursuant to a "plan" is equally applicable to section 105(b) and it must be a "plan for employees." *Alan B. Larkin*, 48 T.C. 629 (1967), aff'd. 394 F. 2d 494 (C.A. 1, 1968). The petitioners do not dispute the existence of this requirement but contend that the corporate resolution was intended to and did in fact constitute a "plan for employees" within the meaning of the statute.

The resolution, passed upon the advice of the corporation's accountant shortly after 10 of the salaried employees [10] had purchased medical insurance under a group policy, provided that "officers and dependents to the extent not covered by existing insurance that medical expenses be payed [sic] by the corporation as permitted by the Medical Section of Internal Revenue Code #105-B." We agree with petitioners that the resolution was intended to qualify as a plan under section 105(b). However, we are unable to find that a "plan for employees" existed at American Foundry.

Under the corporate secretary's own interpretation of the words "to the extent not covered by existing insurance," no officer who was insured under the group policy was entitled to benefits from the corporation. Consistent with this understanding, Jean Meaglia Shives, the corporate secretary and draftsman of the resolution, and her husband did not claim reimbursement for medical expenses in excess of amounts received from their insurance, although by another interpretation of the language they would have been entitled to do so. Further, the testimony of petitioners' witnesses conclusively indicates that the "plan" insofar as there was a plan, was designed solely to benefit Domenic. That this design was accomplished is clear from the record.

Unlike the cases cited to us by petitioners,[11] in the instant case there is no rational basis for distinguishing between Domenic and the other officers. True, he was the founder of and prime contributor to the success of American Foundry, but there were a number of other officer-employees who also served the corporation in similar capacities, sometimes even filling in for Domenic for extended periods, who were not covered by the plan. Nor does the existence of a self-paid group health insurance policy on the other officers offer a rational basis for the dis-

---

[10] Although it does not appear conclusively from the record, it is our understanding that these 10 individuals constituted the entire salaried staff of American Foundry, with the exception of Domenic Meaglia.

[11] See *Bogene Inc.*, 27 T.C. M. 730 (1968) ; *E. B. Smith*, 29 T.C. M. 1065 (1970) ; *Nathan Epstein*, T.C. Memo. 1972–53.

tinction. We therefore find that Domenic did not fall within a distinct class or category of employees as would indicate that the "plan" was one for "employees." *Alan B. Larkin, supra.* The medical expense payments do not meet the requirements of section 105(c) and are therefore includable in Domenic's gross income under section 61(a).

Having accepted the petitioners' construction of the resolution's language in making our finding, we do not specifically pass upon respondent's alternative argument that all of the officers of the corporation were entitled to receive benefits from the corporation to the extent that their medical expenses exceeded reimbursements from the insurance, but that this benefit was never communicated to them. There is, however, ample evidence in the record to support this contention.

The question remains, however, whether the payment of Domenic's medical expenses constituted constructive dividends as contended by the respondent or the payment of additional compensation.

We do not feel that disqualification of a plan from the section 105(c) exclusion necessarily precludes the payments from being compensation. In fact, this Court has recognized that such payments can constitute additional compensation rather than constructive dividends. See, e.g., *Sanders and Sons, Inc.*, 26 T.C. M. 671 (1967); *Alan B. Larkin*, 48 T.C. 629, 635 fn. 7 (1967). As the petitioners point out in their brief, "the only fringe benefit given to Domenic was the medical plan" and we see no reason why the payments may not constitute additional compensation, assuming they otherwise qualify. Whether they do qualify as additional compensation depends upon the corporate resolution of October 23, 1957, and its effect under California law.

There is no doubt but that a corporation and its stockholders may enter into a binding contract. *Lum v. American Wheel & Vehicle Co.*, 165 Cal. 657, 133 Pac. 303 (1913). In *Wilson v. Red Bluff Daily News*, 237 Cal. App. 2d 87, 46 Cal. Rptr. 591 (3d Dist. Ct. App. 1965), the court stated at page 594:

Whether a corporate officer is entitled to compensation depends on the intention of the parties. * * * The parties may manifest their intention in any of the usual ways, that is, by formal contract, by resolution or simply by their actions. When they do so by resolution, the resolution is not itself a contract but only evidence of it. * * *

It has also been held that a corporate resolution might constitute an offer which, if accepted, made a contract. *Hoge v. Lava Cap Gold Mining Corporation*, 55 Cal. App. 2d 176, 130 P. 2d 470 (1st Dist. Ct. App. 1942). See also *Dow v. River Farms Co. of California*, 110 Cal. App. 2d 403, 243 P. 2d 95 (1st Dist. Ct. App. 1952), and *Smith v. Woodville Con. S. M. Co.*, 66 Cal. 398, 5 Pac. 688 (1885), where a corporate resolution was held to be an admission of the amount of an

officer's salary by the board of directors. Therefore, whether or not the resolution of October 23, 1957, conferred upon Domenic contractual rights to a fringe benefit depends upon the intent of the parties.

It is apparent that the primary intent of the board of directors of American Foundry in the 1957 meeting was to benefit Domenic— hopefully through the availability of the exclusion provided by section 105(c). While we are constrained to hold that the benefit of the exclusion did not inure to Domenic as a result of the resolution, the fact that the principal goal failed does not preclude the finding that the corporation may have had another. See, e.g., *Lloyd E. Peterson*, 25 T.C. M. 1002, 1012 (1966). Despite Domenic's good health in 1957, the cost of his insurance, purchased either independently or under the group plan with the other employees, would have been excessive due to his age. A more practical solution, when there was no thought that he would suffer a crippling stroke, was to provide that his medical expenses would be paid by American Foundry. At no time after the passage of the resolution did the directors of the corporation take any action to rescind it, and Domenic continued to render his services. When Domenic was stricken, the corporation immediately undertook to pay the expenses for his care, consistent with its understanding of its obligation. The corporate resolution and the actions of the parties evidence a clear intent on the part of each of them that the medical benefits be a part of Domenic's employment contract, and we expressly so hold.

Having decided that the payment of Domenic's medical expenses was made pursuant to his contract of employment with American Foundry, the sole determination to be made is whether the compensation provided in that contract was reasonable, and therefore deductible by the corporation. As petitioners have pointed out, section 1.162- 7(b) of the Income Tax Regulations clearly contemplates the payment of contingent compensation and states that the circumstances to be considered in determining reasonableness "are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned." See also *California Vegetable Concentrates, Inc.*, 10 T.C. 1158 (1948); *Cecil Randolph Hundley, Jr.*, 48 T.C. 339 (1967).

On October 23, 1957, Domenic Meaglia was in good health. There was nothing in his past medical history to indicate that he would suffer an illness of such magnitude and duration. Those factors which could reasonably have been known to the corporation at that time were that Domenic was receiving none of the "fringe benefits" normally enjoyed by corporate executives; that his salary was, and always had been, eminently reasonable; and that despite his apparent good

health, the cost of obtaining medical insurance for him would have been excessive due to his age.

We seriously doubt whether the respondent would contest the matter had American Foundry decided instead to pay the premiums on an insurance policy for Domenic, assuming it retained no incidents of ownership or benefits therein. See Rev. Rul. 58–90, 1958–1 C.B. 88. That the corporation chose instead to act as a self-insurer, which by hindsight has proved unfortunate, should not cause the corporation to forfeit an otherwise allowable deduction.

Accordingly, we find that when the corporate resolution evidencing the agreed terms of Domenic's employment was passed in 1957, the fringe benefit provided therein was reasonable and within the power of the board of directors. Cal. Corp. Code, sec. 501(f) (West 1955); *Canal Oil Co.* v. *National Oil Co.*, 19 Cal. App. 2d 524, 66 P. 2d 197 (3d Dist. Ct. App. 1937). Under the circumstances existing at that time, a salary of $23,082 coupled with an agreement of employer-paid medical expenses was not excessive compensation to Domenic Meaglia. Therefore, the proceeds of that agreement, received throughout the years in question, do not constitute dividends to Domenic Meaglia and are deductible by American Foundry under section 162(a).

### Salary Paid to Jean Meaglia Shives

Commencing with American Foundry's taxable year 1964, Jean Meaglia Shives' annual salary was $18,000. The respondent seeks to disallow as unreasonable compensation any amount by which she was paid in excess of $5,000. The respondent relies primarily upon the fact that during 1964 Jean's time and efforts on behalf of the corporation were substantially reduced. While we do not disagree with the petitioners that Jean contributed invaluable services to the corporation prior to 1964, we cannot agree that her services thereafter were worth $18,000.

Following her father's stroke in 1961, Jean devoted approximately 60 hours a week to the needs of the business. For these efforts, she received from the corporation, including bonuses, between $25,000 and $28,000 per year. After her workload was reduced, her salary was $18,000 and she received no additional bonuses.

Reasonableness of compensation is a question of fact, which must be decided in light of the individual circumstances of each case. During the years here in issue, Jean Meaglia Shives spent approximately 12 to 20 hours per week at American Foundry. In addition, she performed some services for the corporation in the office she maintained in her home. There is considerable evidence in the record to indicate that her husband, Clyde Shives, took over many of the responsibilities

previously held by her. Upon examination of the entire record, we find that the corporation has established that Jean's services were worth more than $5,000 per year. However, we cannot say that any amount in excess of $7,000 per year has been established as reasonable compensation. Accordingly, we hold that of the $18,000 paid to Jean Meaglia Shives in each of the years in question, $11,000 constituted a constructive dividend from American Foundry, which amount is not deductible by the corporation under section 162(a).

### Expenses of Home Office

Petitioners contend that to the extent that the continuation of Domenic's salary is treated as a dividend, the amount of $2,400 should be deemed to have been paid by the corporation for the use of an office in the home of Domenic and Katie Meaglia. This contention is without merit. American Foundry has never accrued any liability on its books, paid any amount, or taken any deduction on its returns. Even assuming that such an amount had been accrued on American Foundry's books and that the liability had become fixed, such a deduction is barred by the provisions of section 267. See also *Roehl Construction Co.*, 17 T.C. 1037 (1951).

In accordance with the foregoing,

*Decisions will be entered under Rule 50.*