BICKES-WILBERT BURIAL VAULT CO., INC., A DELAWARE CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BICKES-WILBERT MANUFACTURING CO., INC., A DELAWARE CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bickes-Wilbert Burial Vault Co. v. Commissioner
Docket Nos. 9216-82, 9217-82.
United States Tax Court
T.C. Memo 1986-172; 1986 Tax Ct. Memo LEXIS 435; 51 T.C.M. (CCH) 941; T.C.M. (RIA) 86172; April 28, 1986. David J. Duez, for the petitioners. Rosabel I. Seigan, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined the following deficiencies in Federal income tax: Petitioner
Docket No.
Taxable Year
Deficiency
Bickes-Wilbert Burial Vault Co., Inc.
* 9216-82
1975
$2,628.52
Bickes-Wilbert Manufacturing Co., Inc.
* 9217-82
1975
2,159.13
1976
4,700.26
1978
9,271.23
1979
734.38
The issues for consideration are: (1) Whether Bickes-Wilbert Burial Vault Co., Inc. (Sales), and Bickes-Wilbert Manufacturing Co., Inc. (Manufacturing), were incorporated for the principal purpose of avoiding income tax by *437 securing the benefit of multiple surtax exemptions; and (2) whether compensation paid by Manufacturing to its president for the years 1978 and 1979 exceeds a reasonable allowance for services actually performed. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, as supplemented, with its attached exhibits, other than exhibit 41-AO, is incorporated herein by this reference. [1]
Sales and Manufacturing were Delaware corporations in good standing authorized to operate in Illinois. For each of the taxable years at issue, both corporations filed timely Federal corporate income tax returns with the Internal Revenue Service Center in Kansas City, Missouri. At the time the petitions in these cases were *438 filed, both petitioners had as their principal place of business common facilities located in Decatur, Illinois. Organization and Structure of Manufacturing and Sales
For many years, Brownie B. Bickes (Brownie), as sole proprietor and franchisee of the Wilbert W. Haase Co., operated a burial vault business in Decatur, Illinois. Wayne L. Bickes (Wayne) and Jerry H. Bickes (Jerry), Brownie's sons, eventually joined him as partners in the business. By 1968, Wayne and Jerry had acquired their father's interest in the business. In that year the brothers, as 50-percent partners in Bickes-Wilbert Burial Vault Co. (Burial Vault), entered into license and patent agreements with Wilbert, Inc. (Wilbert), the successor to the Wilbert W. Haase Co., for exclusive territorial rights to manufacture and sell Wilbert burial vaults in 13 counties of Illinois, including Macon County, where Decatur is located. In 1971, Wayne and Jerry formed two corporations, Manufacturing and Sales. They separated the single partnership, Burial Vault, into Manufacturing, which molded, cured, stored and custom finished burial vaults, and Sales, which sold, delivered and installed burial vaults. Before the *439 formation of Manufacturing and Sales, both the manufacture and sale of burial vaults were performed by the partnership. The total issued and outstanding capital stock of Manufacturing and Sales each consisted of 1,000 shares of no par common stock. Upon incorporation, 760 shares of Manufacturing and 240 shares of Sales were issued to Wayne, and 760 shares of Sales and 240 shares of Manufacturing were issued to Jerry; [2] Wayne became president of Manufacturing and vice president of Sales, and Jerry became president of Sales and vice president of Manufacturing. Wayne and Jerry considered a number of factors before deciding to form separate corporations with unequally divided stock ownership. They considered what would happen to the business and their families if one of them died. The brothers were mindful that the death in 1963 of their uncle, George Bickes, a partner in the Wilbert franchise in Fort Branch, Indiana (Fort Branch), had caused uncertainty regarding *440 control of that franchise. Wayne and Jerry wanted an arrangement that would protect their widows, yet prevent an outsider, such as the husband of a remarried widow, from interfering in the family burial vault business. The brothers discussed forming one corporation owned 50 percent by each brother, and two corporations, each owned 100 percent by one brother. They rejected these ideas in favor of a business structure giving each brother a majority interest and control of one corporation, and a minority interest and access in the records of the other corporation. Wayne and Jerry envisioned that the surviving brother would look after his brother's family. They believed that the corporation controlled by the survivor could function independently in the event of conflict with those in control of the other corporation: Sales could buy vault forms and manufacture burial vaults; Manufacturing could acquire trucks and deliver vaults. They believed that Wilbert would work with the survivor. The brothers thought that goodwill developed over many years in business and business know-how would favor the surviving brother in any competition with someone in control of the other corporation. *441 In deciding to form two corporations the brothers also looked at the impact of taxation. They knew that reinvested profits would be taxed at more favorable rates if the business were conducted in corporate rather than partnership form. They also knew that forming two corporations instead of one potentially offered an additional surtax exemption, which would resutl in overall tax savings. The brothers additionally considered how they could best avoid unionization of their business and disruptive labor activity. In 1968 an unsuccessful attempt had been made to unionize Fort Branch, which then operated as a single corporation. Wayne and Jerry believed that separate corporations with smaller work forces were less likely to unionize than a single corporation with a larger work force. The brothers also believed that separate corporations could assume each other's activities if necessary to deter a labor action directed at one of the corporations. Finally, the Bickes brothers considered the threat of tort liability. In the 1950's, Brownie, Wayne and Jerry had a profitable partnership that sold propane and fuel oil. A disaster involving a propane truck owned by another company *442 led the Bickes to sell their business. Wayne and Jerry feared that an accident involving trucks of the burial vault business would occur. As the brothers saw things, in the event of an accident involving Sales' trucks, Manufacturing could acquire trucks and continue the business without a work stoppage. When Manufacturing and Sales were incorporated in 1971, the inventory of burial vaults and some of the assets related to their manufacture were placed in Manufacturing. Infant burial vaults and other items not manufactured by Manufacturing were placed in Sales. Not all of the equipment of Burial Vault was transferred to the two corporations. Trucks and manufacturing forms were kept for lease to the two corporations. The burial vault business' land and buildings, which were owned jointly by Wayne and Jerry as individuals, were leased to Manufacturing and Sales in separate agreements with each corporation that provided for exclusive and common use of parts of the business premises. The license and patent agreements between Wilbert and Wayne and Jerry, doing business as Burial Vault, were not modified to reflect the formation of Manufacturing and Sales. These agreements explicitly *443 prohibited sublicensing without the prior express written consent of Wilbert as licensor. Subsequent to the incorporations, Manufacturing and Sales acquired additional assets. In 1973 Manufacturing and Sales each received from Burial Vault one-half of its stockholding in Wilbert, Inc. Since then the two corporations have acquired additional Wilbert stock. Manufacturing and Sales presently own less than 5 percent of the total stock of Wilbert. Certain items of personalty initially leased from Burial Vault were later replaced by property purchased by the corporations. Operation of Manufacturing and Sales
Manufacturing operated the plant, which created vaults by pouring concrete into forms. After a curing period, unfinished vaults in a number of different grades and sizes were held in storage as inventory. Sales, which maintained no inventory, purchased approximately 95 percent of the output of Manufacturing. Sales operated a fleet of trucks and maintained personal contacts with funeral directors. Petitioners had an 85 to 90-percent market share of the burial vault business in the Decatur area. When a funeral director placed an order with Sales, he would designate a specific *444 cemetery and time for delivery of a burial vault. Sales then ordered the appropriate size vault from Manufacturing, which completed the finishing of the vault in accordance with the order. An employee of Sales would pick up the vault from Manufacturing's facilities and deliver it to the cemetery at the appropriate time. When the grave-side services were concluded the delivery man would lower the casket into the vault, slide the lid over the self-sealing vault, lower the vault to the bottom of the grave and remove the equipment. Buildings at the common business address of Manufacturing and Sales were used by Sales, Manufacturing or both. Accounting work for both corporations, as well as for other businesses owned by the Bickes family, was done in one building on the premises. Personnel common to both corporations performed all accounting and record keeping. The cost of operating the single accounting department was shared by all of the companies served. Manufacturing and Sales maintained separate books and records and separate bank accounts. Without regard to tax consequences, expenses in addition to those that would have been incurred by a single corporation resulted from *445 the maintenance of Manufacturing and Sales as separate corporations. [3]
Manufacturing and Sales sometimes borrowed from one another to pay current bills or paid bills directly for each other. The net profit per burial unit realized by each corporation was partially determined by the unit price that Manufacturing established for its sale of units to Sales. The unit price was determined in part by an intention to have the profits of the two corporations come out relatively equal. Acquisition of Other Burial Vault Companies
The Bickes family was active in the burial vault business outside of Illinois. Brownie acquired the Fort Branch franchise sometime during the 1940's, then let his brother, George Bickes, and his brother-in-law, Jay Shudder, join him as partners. In 1966 Fort Branch was incorporated and a subchapter S election was made. The subchapter S election was terminated in 1976 or 1977. By 1974, Wayne and Jerry had each acquired 35 percent of the shares of Fort Branch through inheritance and the purchase of stock from family members.By 1976 Manufacturing and Sales had acquired the Wilbert Bloomington, *446 Illinois, franchise. In 1978, Manufacturing and Sales formed an equal partnership, Jackson Wilbert Burial Vault Co., and purchased all of the operating assets and rights of Jackson Wilbert Burial Vault Co., Inc., of Jackson, Tennessee. Following 1978, Wilbert franchises in Columbia, Tennessee, Nashville, Tennessee, and Tupelo, Mississippi, were acquired. Financial Performance of Manufacturing and Sales
From their incorporation [4] through the taxable years at issue, the gross receipts, taxable income (after compensation to officers) and tax liability of Manufacturing and Sales were as follows: Gross Receipts
Manufacturing
Sales
1971
$139,425.00
$278,088.57
1972
291,652.30
597,251.19
1973
319,143.70
658,902.58
1974
376,721.50
740,085.02
1975
419,692.75
809,531.76
1976
472,558.82
895,457.25
1977
567,441.30
1,068,897.54
1978
587,073.00
1,163,546.14
1979
634,574.95
1,223,919.03
Taxable Income
Manufacturing
Sales
1971
$12,096.33
$7,092.05
1972
20,750.62
22,967.48
1973
25,606.36
26,753.37
1974
25,643.64
28,634.35
1975
41,725.80
30,215.29
1976
31,248.65
40,373.27
1977
47,666.72
36,532.63
1978
30,934.34
27,971.32
1979
22,594.70
6,838.14
*447 Tax Liability
Manufacturing
Sales
1971
$2,661.19
$1,560.25
1972
4,565.14
5,052.85
1973
5,791.05
6,341.62
1974
5,808.95
7,244.49
1975
8,679.68
6,147.36
1976
5,847.77
4,846.23
1977
2,357.67
0   1978
0   0   1979
0   187.95
Both Manufacturing and Sales were calendar year taxpayers. Compensation of Wayne Bickes
Wayne worked part-time for Manufacturing and Sales and also practiced law with a Decatur law firm. As of 1978 Wayne had over 25 years of experience in the burial vault business. He usually maintained daily contact with the vault plant, and was involved with all major purchases and personnel changes. He provided legal services to Manufacturing and was readily available for consultation. Wayne was instrumental in the acquisition of the Bloomington, Illinois, Wilbert franchise and, in 1978 and 1979, the Wilbert franchises in Tennessee and Mississippi. Jerry, in contrast to his brother, worked full-time for the various family businesses. Like *448 Wayne, Jerry had many years of experience in the burial vault business. The amount of compensation paid to Wayne and Jerry was decided by them, as the directors of each corporation, in mid-December of and for the year then ending. The cash flow of the corporations and the brothers' financial needs and resources influenced their decisions. Salaries paid by one corporation were affected by salaries paid by the other corporation. As reported on the tax returns of Manufacturing and Sales, Wayne and Jerry received the following compensation: Wayne
Jerry
Manufacturing
Sales
Manufacturing
Sales
1971
$0   $0   $9,000
$10,500
1972
0   0   18,000
21,000
1973
5,000
0   20,000
26,000
1974
6,000
0   23,000
26,000
1975
0   0   18,000
21,000
1976
5,000
3,000
18,000
21,000
1977
18,000
19,000
18,000
37,000
1978
35,000
6,000
30,000
42,000
1979
34,300
0  30,000
42,000
Of Wayne's 1978 compensation from Manufacturing, $11,000 was in the form of a bonus declared on December 31, 1978. Jerry did not receive an end-of-year bonus from Manufacturing for 1978. Manufacturing declared *449 no dividends in 1978 and 1979. Its retained earnings in those years were $195,212.74 and $218,796.42, respectively. Respondent's Proposed Adjustments
Respondent issued notices of deficiency to Manufacturing and Sales. In these notices respondent disallowed separate surtax exemptions for the two corporations. Instead, respondent proposed allocating equally between Manufacturing and Sales a single surtax exemption, for the stated reason that the two corporations had been formed instead of one for the principal purpose of tax avoidance through securing the benefit of an additional surtax exemption. In its notice to Manufacturing, respondent allowed only part of the deductions claimed for 1978 and 1979 for compensation to Wayne. Respondent disallowed claimed deductions of $17,157.14 for 1978 and $17,857.14 for 1979, for the stated reason that these amounts exceeded a reasonable allowance for salaries or other compensation for personal services rendered by Wayne. OPINION Principal Purpose for the Formation of Manufacturing and Sales
Section 269(a)[5] provides that if any *450 person acquires control of a corporation, and the principal purpose for which such acquisition is made is evasion or avoidance of income tax by securing the benefit of a deduction, credit or other allowance which such person would not otherwise enjoy, then respondent may disallow such deduction, credit or other allowance. Section 269(b)(2) [now section 269(c)(2)] authorizes respondent to distribute, apportion or allocate such deductions, credits or allowances between corporations, and to allow such deductions, credits or allowances so distributed, apportioned or allocated, if respondent determines that such allowance will not result in evasion or avoidance of the tax. The term "allowance" refers to anything in the Internal Revenue laws that has the effect of diminishing tax liability. Sec. 1.269-1(a), Income Tax Regs. For purposes of section 269, acquisition of a corporation includes formation of a new one, Napsky v. Commissioner,371 F.2d 189 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Kessmar Construction Co. v. Commissioner,39 T.C. 778, 796 (1963), affd. 336 F.2d 865 (9th Cir. 1964); *451 and the corporate surtax exemption is an allowance. Bobsee Corp. v. United States,411 F.2d 231, 237 (5th Cir. 1969). Section 269 applies only if tax avoidance is the principal purpose for an acquisition. Sec. 1.269-3(a), Income Tax Regs.; Rocco, Inc. v. Commissioner,72 T.C. 140, 154 (1979); Capri, Inc. v. Commissioner,65 T.C. 162, 178 (1975). Tax avoidance is the principal purpose if it exceeds in importance any other purpose. Sec. 1.269-3(a), Income Tax Regs. The determination of the principal purpose in acquiring control of a corporation is a question of fact that depends upon the intent of those who acquire control. Southern Dredging Corp. v. Commissioner,54 T.C. 705, 718 (1970). Their testimony is of particular importance because the test is one of subjective intent. See Capri, Inc. v. Commissioner,supra at 179; *452 D'Arcy-MacManus & Masius, Inc. v. Commissioner,63 T.C. 440, 450 (1975). Respondent argues that when Wayne and Jerry formed two corporations instead of a single corporation to carry on their burial vault business, their principal purpose was evasion or avoidance of income tax by claiming two $25,000 section 11(c) exemptions instead of one. Petitioners argue to the contrary, and we agree with them. Respondent stresses that Wayne and Jerry were aware of the tax consequences of incorporating separate businesses, particularly the benefit of multiple surtax exemptions. By itself, however, knowledge of the tax benefits of multiple surtax exemptions is not such a substantial factor as to justify invoking the provisions of section 269. Southern Dredging Corp. v. Commissioner,supra at 722. Prudent business planning dictates consideration of the tax aspects of a transaction. D'Arcy-MacManus & Masius, Inc. v. Commissioner,supra at 451. We believe that tax considerations were less important to the Bickes brothers than other factors. *453 Wayne and Jerry were concerned about continuation of the burial vault business and protection of their families in the event either one of them died. The brothers described how the survivor of the two could use his separate interests in Manufacturing and Sales to control the overall direction of the two corporations and at the same time look after his brother's family. Respondent describes the Bickes' plan as flawed and illogical. According to respondent, the corporations were subject to division and disruption upon the death of either brother because essential business assets remained in the hands of the partnership after incorporation. [6] Respondent doubts that two brothers who obviously share a close relationship would premise a plan for the welfare of their respective families on the threat of intra-family business competition. *454 The question before us, however, is not whether the Bickes brothers adopted the best arrangement, or whether they flawlessly conceived of or executed their plan; it is, rather, what relative importance they placed on tax avoidance or evasion. Whether the brothers could have more effectively accomplished their goals in another fashion becomes irrelevant because we find their testimony to be credible. Management's credible testimony is a significant factor in determining the principal purpose for which a corporation is formed. See Southern Dredging Corp. v. Commissioner,supra at 719. The Bickes brothers testified convincingly about their intent to protect their families and their business by separately incorporating Manufacturing and Sales. The record as a whole supports their testimony. We accordingly find that the brothers formed two corporations more out of regard for the welfare of their business and families than reduction of their tax burden. The record reflects that the brothers had additional reasons for forming two corporations. Wayne testified that they *455 were worried about a tort action being brought against the business. Multiple corporations in fact are one means of insulating an enterprise from liability, and we conclude that Wayne's testimony was not without substance. Wayne also testified to the effect that he and his brother saw separate corporations as a defense against unionization and union activity. Since the two corporations shared a common business address, they might share a common fate in the event of labor action. Nevertheless, we believe that Wayne was sincere in his testimony. In addition to challenging the Bickes' stated purposes for forming two corporations, respondent attacks "inter-relationship, inter-dependency and manipulation indicative of a unified enterprise." Respondent contends as follows: Manufacturing and Sales, together, operated much as Burial Vault had alone; Manufacturing and Sales attempted to equalize their expenses and profits; [7] the two corporations engaged in intercorporate borrowing; the salary paid each brother by one corporation was affected by the salary paid each brother by the other corporation; and the taxable income of each corporation was at or near the critical surtax figure *456 of $25,000. [8] Respondent concludes that Manufacturing and Sales were no more than the "division of a single integrated business, segregated to take advantage of the extra surtax exemption." [9]
*457 Section 269 was adopted to prevent tax avoidance resulting from abuse of the surtax exemption. See S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483, 534. As we have indicated, section 269 looks to the principal purpose for which separate corporations are formed. Application of the statute is not mandatorily required where separate corporations have close operational ties. Petitioners have persuaded us that the principal purpose for which Manufacturing and Sales were formed was not tax avoidance or evasion. Petitioners are entitled to two full surtax exemptions. Reasonable Compensation for Wayne Bickes
Section 162(a)(1) allows a deduction for ordinary and necessary business expenses including "a reasonable allowance for salaries or other compensation for personal services actually rendered." to be deductible, compensation payments must be both purely for services and reasonable. Sec. 1.162-7, Income Tax Regs. Whether compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and *458 circumstances of a case. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1155 (1980). The determination of the Commissioner is presumptively correct, and the burden of proving the reasonableness of compensation is upon petitioners. Botany Worsted Mills v. United States,278 U.S. 282 (1929). Many factors are relevant in determining whether compensation is reasonable. These include the employee's qualifications; the nature, extent and scope of the employee's duties; the responsibilities and hours involved in his job; the salary policy of the employer to its other employees; the amount of compensation paid to the employee in prior years; the employee's responsibility for the employer's inception and success; the time of the year the employee's compensation was determined; and under-compensation of the employee in prior years. Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), *459 revg. a Memorandum Opinion of this Court; Foos v. Commissioner,T.C. Memo. 1981-61. No single factor is decisive. Mayson Mfg. Co. v. commissioner,supra at 119. Where officershareholders, who are in control of a corporation, set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits. Home Interiors & Gifts, Inc. v. Commissioner,supra at 1156. Petitioners argue that the compensation paid to Wayne by Manufacturing in 1978 and 1979 did not exceed a reasonable allowance for services actually performed. Respondent contends that a portion of the salary paid to Wayne was in excess of reasonable compensation. We agree with respondent's contention, although we differ with respondent as to the amount of compensation reasonable for Wayne's services to Manufacturing. Petitioners and respondent emphasize different aspects of Wayne's involvement with Manufacturing. While petitioners point to the importance of Wayne's services, respondent focuses on their nature and frequency. Unlike Jerry, Wayne did not devote his full time to the business. [10] No specific evidence *460 was offered as to the number of hours Wayne worked for Manufacturing. The record reflects, however, that Wayne was involved in critical business decisions, particularly the decision to expand into new markets. He was available as needed for business and legal consultations. Wayne's services to Manufacturing were far from casual, sporadic or insignificant. Respondent argues that Wayne's salary was determined without reference to the value of his services. It was the practice of Wayne and Jerry to meet in mid-December of each year to determine their compensation from the calendar-year corporations for the year about to end. This practice of determining compensation when much of the financial information from the corporations was available suggests an intention to distribute corporate earnings as compensation. Cf. Ecco High Frequency Corp. v. Commissioner,167 F.2d 583, 585 (2d Cir. 1948), *461 affg. a Memorandum Opinion of this Court, cert. denied 335 U.S. 825 (1948). The declaration by Manufacturing on December 31, 1978, of an $11,000 bonus to Wayne strengthens the inference that Wayne's compensation for that year was not based solely on the value of his services. Petitioners cite persistent cash flow problems as affecting the salary Manufacturing paid to its officers. This cash flow problem, according to petitioners, did not permit payment of dividends and allowed for "something approaching a reasonable salary" to be paid to officers only in 1978 and 1979. A cash flow problem, however, does not explain how Manufacturing decided the amount of Wayne's compensation in 1978 or 1979, or justify those amounts as payment purely for services. Petitioners argue that the failure to pay Wayne a significant salary in years prior to 1978 is justification for the compensation paid him in 1978 and 1979. In order for a corporation to be entitled to a deduction for compensation payments made to an employee for undercompensated past services, it is necessary that the corporation *462 establish both the amount of undercompensation, American Foundry v. Commissioner,59 T.C. 231, 239 (1972), affd. on this issue and revd. on other issues 536 F.2d 289 (9th Cir. 1976), and that current payments were intended as compensation for past services. Perlmutter v. Commissioner,373 F.2d 45, 48 (10th Cir. 1967), affg. 44 T.C. 382 (1965). This petitioners have not done. No portion of the compensation paid to Wayne by Manufacturing in 1978 and 1979 was identified as representing prior years' compensation. The conclusion we draw from our review of the evidence is that part of Wayne's compensation in 1978 and 1979 represents a distribution of profits. We do not, however, accept respondent's allowance for each year as reasonable compensation for Wayne's services to Manufacturing. Manufacturing benefited from Wayne's many years of experience in the burial vault business, and his ability to provide both business and legal services to the corporation. Wayne was an integral and active part of the management of the corporation. It is our best judgment and we hereby find that reasonable compensation for Wayne from Manufacturing *463 for each of the years 1978 and 1979 was $25,000. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
*. By order of the Court, these cases were consolidated for the purposes of trial, briefing and opinion.↩
1. The parties in their stipulation reserved the right to object at trial to the relevance of any exhibit. Exhibit 41-AO is a copy of a proposed Federal Trade Commission complaint against Wilbert, Inc. At trial respondent objected to the relevance of this document, and we reserved ruling on the objection. We hereby sustain the objection.↩
2. In 1976, Wayne and Jerry exchanged stock in Manufacturing and Sales, so that their respective interests in the two corporations became: ↩
Manufacturing
Sales
Wayne
85%
15%
Jerry
15%
85%
3. For example, additional state franchise fees were incurred.↩
4. Manufacturing and Sales were incorporated in July 1971. For 1971 both corporations filed returns for a taxable year beginning July 1 and ending Dec. 31.↩
5. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue.↩
6. Respondent notes that the license and patent agreements, Wilbert stock, factory and delivery equipment and business premises and facilities remained with Burial Vault. (In fact, at the time Manufacturing and Sales were incorporated, Wayne and Jerry, not the partnership, held title to the real property.) Respondent argues from the disposition of assets that no serious consideration was given to the idea that one corporation might assume the entire business operation if faced with dealing with disruptive heirs. We think that valid business reasons and lack of immediate necessity better explain why certain assets were kept outside of the corporations. In the case of the license and patent agreements, inadvertence may have been a factor. Certain assets of the partnership not initially transferred to the corporations were either later transferred or replaced by other property.↩
7. Respondent maintains that rental payments to Burial Vault reported on the tax returns of Manufacturing and Sales are discrepant in amount with check register entries and contractual obligations. The discrepancy, according to respondent, is evidence that Manufacturing and Sales were an integrated entity that manipulated factors for the best tax consequences. The contracts, tax returns and check registers do not necessarily present a complete picture of the finances of the two corporations. The contractual obligations, for instance, may have changed over time. It is interesting to note that respondent does not assert that the expenses claimed by petitioners on their tax returns were not actually incurred.↩
8. In Atlas Storage Company v. United States,306 F. Supp. 570 (S.D. W.Va. 1969), affd. per curiam 437 F.2d 1319 (4th Cir. 1971), 18 corporations conducted an integrated warehouse business. Regardless of gross receipts, the taxable income of each corporation generally remained at or below the $25,000 surtax exemption. This pattern of abuse is not present here. Only two corporations were formed. The taxable income of each corporation was above $25,000 in six of the nine years between 1971 and 1979, was above $40,000 for Manufacturing for two years and Sales for one year, and generally rose with gross receipts. We do not doubt that the corporations, once formed, operated so as to minimize their taxes. However, this does not establish that tax avoidance was the principal purpose for their formation. ↩
9. Respondent cites S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483, 533-534, where the following statement is made: It is not intended, however, that the exemption of the first $25,000 of a corporation's surtax net income from the surtax shall be abused by the splitting up, directly or indirectly, of a business enterprise into two or more corporations or the forming of two or more corporations * * * to carry on an integrated business enterprise. * * *↩
10. Jerry described the operation of Manufacturing as follows: One beautiful part about it was * * * the [m]anufacturing is a five day a week job. I mean with a good manager, a, a chief operating officer just doesn't have to be there on the premises at all times with that.↩